LAWSON and wife, Appellants, vs. HOUSING AUTHORITY OF
THE CITY OF MILWAUKEE and others, Respondents.

*May 6—June 1, 1955.*

270

For the appellants there was a brief and oral argument by *M. Michael Essin* of Milwaukee.

For the respondents there was a brief by *Walter J. Mattison,* city attorney, and *Alan H. Steinmetz,* assistant city attorney, and oral argument by *Mr. Steinmetz.*

CURRIE, J.   The following issues are presented upon this appeal:

(1) Whether the facts alleged in the amended complaint present a justiciable controversy for declaratory relief within Wisconsin's Uniform Declaratory Judgments Act (sec. 269.56, Stats.).

(2) Whether the Authority is empowered to adopt its Resolution 513.

(3) Whether such resolution violates any of the provisions of the federal and state constitutions.

The defendants contend that the plaintiff tenants possess no vested right to continue to occupy the apartment in which they and their children reside in the Hillside Terrace housing project, inasmuch as the Authority as landlord would possess the right to evict them for no reason whatsoever because of the expiration of plaintiffs' original lease. In other words, the position of the Authority is that it stands in the same category as any nongovernmental landlord, and is subject to no restrictions in choosing the persons it desires as tenants of its housing project, which would not be applicable to landlords generally, except only such as are specifically prescribed by sec. 66.402 (1), Stats.[1]

---

[1] Sec. 66.402 (1)   In the operation or management of housing projects an Authority shall at all times observe the following duties with respect to rentals and tenant selection:

The defendants by their general demurrer have admitted the truth of the allegations of fact contained in the amended complaint. It appears from such allegations that the only reason the Authority seeks to evict the plaintiffs is because of their refusal to execute the requested certificate of non-membership in any of the listed organizations which have been designated as subversive by the attorney general. We then have presented the issue of whether a governmental agency can deny to citizens a privilege, which lies within its discretion to grant or withhold, on the ground that such persons are members of an organization agitating for political or economic change, and, when such denial is challenged by court action, successfully defend on the ground that only a privilege and not a vested right is involved.

The First amendment to the United States constitution provides as follows:

(a) It may rent or lease the dwelling accommodations therein only to persons of low income and at rentals within the financial reach of such persons of low income.

(b) It may rent or lease to a tenant dwelling accommodations consisting of the number of rooms (but no greater number) which it deems necessary to provide safe and sanitary accommodations to the proposed occupants thereof, without overcrowding.

(c) It shall not accept any person as a tenant in any housing project if the person or persons who would occupy the dwelling accommodations have an aggregate annual income in excess of five times the annual rental of the quarters to be furnished such person or persons, except that in the case of families with minor dependents such aggregate annual income may exceed five times the annual rental of the quarters to be furnished by $100 for each minor dependent or by an amount equal to the annual income of the minor dependents; in computing the rental for this purpose of selecting tenants, there shall be included in the rental the average annual cost (as determined by the Authority) to the occupants, of heat, water, electricity, gas cooking range, and other necessary services or facilities, whether or not the charge for such services and facilities is in fact included in the rental. For the purposes of this subsection, a minor shall mean a person less than twenty-one years of age.

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."

While the due-process clause of the Fourteenth amendment does not incorporate all of the provisions of the first ten amendments to the United States constitution so as to make the same applicable to state action,[2] the freedoms of the First amendment are among the liberties of the people protected against state interference or restriction by such due-process clause.[3]

Secs. 3 and 4, art. I of the Wisconsin constitution, guarantee the same freedom of speech and right of assembly and petition as do the First and Fourteenth amendments of the United States constitution. Necessarily included within such constitutionally guaranteed incidents of liberty is the right to exercise the same in union with others through membership in organizations seeking political or economic change.[4]

If the state, or one of its political subdivisions, were to pass a criminal statute or ordinance making it unlawful for a person to belong to any organization advocating political or economic change or reform, such enactment would at once be held unconstitutional as violative of the liberties of citizens

[2] *Adamson v. California* (1947), 332 U. S. 46, 67 Sup. Ct. 1672, 91 L. Ed. 1903, 171 A. L. R. 1223; and see article, "Does the Fourteenth Amendment Incorporate the Bill of Rights?" by Professor Charles Fairman, 2 Stanford Law Review (1949), 5.

[3] *Gitlow v. New York* (1925), 268 U. S. 652, 666, 45 Sup. Ct. 625, 69 L. Ed. 1138; *De Jonge v. Oregon* (1937), 299 U. S. 353, 364. 57 Sup. Ct. 255, 81 L. Ed. 278; *Thomas v. Collins* (1945), 323 U. S. 516, 65 Sup. Ct. 315, 89 L. Ed. 430; *Saia v. New York* (1948), 334 U. S. 558, 68 Sup. Ct. 1148, 92 L. Ed. 1574; and *Burstyn v. Wilson* (1952), 343 U. S. 495, 72 Sup. Ct. 777, 96 L. Ed. 1098.

[4] *American Steel Foundries v. Tri-City Council* (1921), 257 U. S. 184, 42 Sup. Ct. 72, 66 L. Ed. 189. See also concurring opinion by Mr. Justice FRANKFURTER in *Wieman v. Updegraff* (1952), 344 U. S. 183, 194, 195, 73 Sup. Ct. 215, 97 L. Ed. 216.

guaranteed by the First and Fourteenth amendments of the United States constitution. The holding out of a privilege to citizens by an agency of government upon condition of nonmembership in certain organizations is a more subtle way of encroaching upon constitutionally protected liberties than a direct criminal statute, but it may be equally violative of the constitution. Surely a citizen, to whom such a privilege is denied on the sole basis of membership in some organization, should be accorded the right to test the constitutionality of such a regulation in court. If a precedent should be established, that a governmental agency whose regulation is attacked by court action can successfully defend such an action on the ground that the plaintiff is being deprived thereby only of a privilege, and not of a vested right, there is extreme danger that the liberties of any minority group in our population, large or small, might be swept away without the power of the courts to afford any protection.

The more that government engages in any activity formerly carried on by private enterprise, the more real is the peril. For example, the number of rental units for residence housing in the Authority's Hillside Terrace housing project constitutes a very small percentage of the total of all such units in Milwaukee, so that the number of people subjected to pressure by enforcement of Resolution 513 would constitute but a nominal percentage of the total population of the city. On the other hand, if the government, or an agency thereof, owned 90 per cent of all rental units available for private housing in the nation as a whole, or even in a particular state or municipality, the number of people subjected to pressure by such a plan, of requiring a certificate of nonmembership as a condition of tenancy, would be very considerable. It is easy to foresee how those in the control of a government could use such a device to effectively undermine and render impotent any political party or other organization, which opposed their continued hold on the government, by simply

labeling the same as "subversive," if the courts were powerless to provide a remedy.

In *Frost & Frost Trucking Co. v. Railroad Comm.* (1926), 271 U. S. 583, 593, 46 Sup. Ct. 605, 70 L. Ed. 1101, 47 A. L. R. 457, the United States supreme court rejected the defense of the defendant railroad commission that the plaintiff's cause of action was only concerned with a privilege, and not a vested right, and declared in stirring language:

"It would be a palpable incongruity to strike down an act of state legislation which, by words of express divestment, seeks to strip the citizen of rights guaranteed by the federal constitution, but to uphold an act by which the same result is accomplished under the guise of a surrender of a right in exchange for a valuable privilege which the state threatens otherwise to withhold."

To similar effect is the following statement by the same court in *Hannegan v. Esquire, Inc.* (1946), 327 U. S. 146, 156, 66 Sup. Ct. 456, 90 L. Ed. 586:

"But grave constitutional questions are immediately raised once it is said that the use of the mails is a privilege which may be extended or withheld on any grounds whatsoever. See the dissents of Mr. Justice BRANDEIS and Mr. Justice HOLMES in *Milwaukee Publishing Co. v. Burleson*, 255 U. S. 407, 421–423, 430–432, 437–438. *Under that view the second-class rate could be granted on condition that certain economic or political ideas not be disseminated."* (Italics supplied.)

Even more apropos to the facts of the instant case is the following statement appearing in the concurring opinion of Mr. Justice FRANKFURTER in *American Communications Asso. v. Douds* (1950), 339 U. S. 382, 417, 70 Sup. Ct. 674, 94 L. Ed. 925:

"This is so not because congress in affording a facility can subject it to any condition it pleases. It cannot. Congress

may withhold all sorts of facilities for a better life but if it affords them it cannot make them available in an obviously arbitrary way or exact surrender of freedoms unrelated to the purpose of the facilities."

The Illinois supreme court passed upon the identical issue herein raised by the defendant Authority in the case of *Chicago Housing Authority v. Blackman* (1954), 4 Ill. (2d) 319, 122 N. E. (2d) 522, 524. In that case the Chicago Housing Authority operated public-housing facilities financed by federal aid, and adopted a resolution requiring its tenants to execute a certificate stating that the signer thereof swore that he is not " 'affiliated directly or indirectly with any communist organization or any communist-front organization, or any foreign political agency, party, organization, or government which advocates the overthrow of constitutional government by force or other means not permitted under the constitution of the United States or the constitution of this state; that I do not directly or indirectly teach or advocate the overthrow of the government of the United States or of this state or any unlawful change in the form of the governments thereof by force or any unlawful means.' " The Chicago Housing Authority brought action to evict the defendant tenants for failure to subscribe such a certificate and secured a summary judgment ordering such eviction and the tenants appealed. The Chicago Housing Authority advanced the same argument on appeal as did the Authority in the case at bar, viz., that the tenants had no vested rights which would permit them to raise the issue of unconstitutionality. In rejecting such contention, the Illinois court declared (122 N. E. (2d) 524):

"Appellee insists that since it could evict in any event merely by giving notice, the fact that it assigned as a reason therefor appellants' refusal to subscribe to the oath is immaterial and does not raise any constitutional issue. *The argument, in other words, is that because the tenants have*

*no legal right to occupy the housing accommodations, they cannot be deprived of any constitutional right by the requirements in question. The position is untenable. . . .* Even though appellants have no right to remain as tenants of appellee, they may not, as a condition of continued occupancy, be required to comply with unconstitutional requirements." (Emphasis supplied.)

Not only are there the strongest policy reasons for holding that plaintiffs' amended complaint states a justiciable controversy, but the foregoing cases provide the necessary precedents for such a conclusion. We, therefore, hold that the allegations of the amended complaint do state a justiciable controversy.

The first ground urged by plaintiffs for this court invalidating Resolution 513 adopted by the Authority, pursuant to which demand was made upon plaintiffs to execute the nonmembership certificate, is that the Authority had no statutory or implied power to adopt such resolution.

The Housing Authority of the city of Milwaukee was created under, and exists solely by virtue of, the Wisconsin Housing Authorities Law comprising secs. 66.40 to 66.404, Wis. Stats. The defendant Authority contends that sec. 66.40 (21) specifically authorized it to comply with the Gwinn Amendment by adopting Resolution 513 with respect to the Hillside Terrace housing project which was financed through federal aid. The Illinois supreme court in *Chicago Housing Authority v. Blackman, supra,* construed a provision of the Illinois Housing Authorities Act (sec. 25.01, ch. 67½, Illinois R. S. 1953) as not empowering the Chicago Housing Authority to require certificates of nonmembership in subversive organizations as a condition to tenancy of housing projects financed with federal assistance. In its opinion in that case the Illinois court stated (122 N. E. (2d) 526):

"While appellee [Chicago Housing Authority] may voluntarily contract with an agency of the federal government

within the authority granted to it by the state, and may take action reasonably calculated to secure the financial aid of the federal government, such action must have some relation to the statutory purpose. The purpose of the Illinois Housing Authorities Act is to eradicate slums and provide housing for persons of low-income class. See *Krause v. Peoria Housing Authority*, 370 Ill. 356, 373, 19 N. E. (2d) 193. It is evident that the exclusion of otherwise qualified persons solely because of membership in organizations designated as subversive by the attorney general has no tendency whatever to further such purpose."

Some members of this court are inclined to disagree with the above-stated conclusion of the Illinois court. However, even if we were to hold that the provisions of sec. 66.40 (21), Stats., authorized the Authority to adopt Resolution 513 pursuant to the demand of the federal government that it do so in compliance with the Gwinn Amendment, the Authority would have no power to perform an unconstitutional act. This is because no governmental agency has any power to adopt an unconstitutional rule or procedure, even though it may have been specifically authorized by statute so to do. For this reason we consider the crux of the present controversy to be the issue of constitutionality.

The Gwinn Amendment became effective July 5, 1952, and provided in part as follows: "No housing unit constructed under this chapter, shall be occupied by a person who is a member of an organization designated as subversive by the attorney general: *Provided further,* That the foregoing prohibition shall be enforced by the local housing authority, . . ." (42 USCA, sec. 1411c). In order to understand the reference therein to organizations listed as *"subversive"* by the attorney general it is necessary to resort to Executive Order No. 9835 (5 USCA, sec. 631; 12 Fed. Reg. 1935) promulgated by the president on March 21, 1947, as part of the employees loyalty program in the executive branch of the government. Such executive order provided for the

creation of a loyalty review board, and paragraph 3 of Part III of the order read as follows:

"The loyalty review board shall currently be furnished by the department of justice the name of each foreign or domestic organization, association, movement, group, or combination or persons which the attorney general, after appropriate investigation and determination, designates as totalitarian, fascist, communist, or *subversive* or as having adopted a policy of advocating or approving the commission of acts of force or violence to deny others their rights under the constitution of the United States, or as seeking to alter the form of government of the United States by unconstitutional means." (Italics supplied.)

There is attached as an exhibit to plaintiffs' amended complaint a list of over 200 organizations bearing the heading, "Consolidated List, dated November 10, 1952, of Organizations Designated by the Attorney General of the United States as within Executive Order No. 9835." A printed copy of such list was mailed by the Authority to the plaintiffs together with the certificate of nonmembership at the time plaintiffs were requested by letter to subscribe such certificate. The certificate itself has reference only to nonmembership in any organization listed on such list.

On April 27, 1953, Executive Order No. 9835 was superseded and repealed by Executive Order No. 10450 (5 USCA, sec. 631; 18 Fed. Reg. 2489), but sec. 12 of such new executive order requires the department of justice to "continue to furnish the information described in paragraph 3 of Part III of said Executive Order No. 9835, . . . but directly to the head of each department and agency." Executive Order No. 10450 by its terms became effective thirty days after its date. On May 5, 1953, the attorney general, pursuant to authority vested in him by such order, prescribed certain rules of procedure "with respect to notice, hearing, and designation of organizations in connection with the federal employee

security program," which were published May 6, 1953, in 18 Fed. Reg. 2619. Under such rules any organization already designated by the attorney general as subversive was given the right within ten days after the effective date of Executive Order No. 10450 (which was May 27, 1953) within which to file notice of contest of such designation and provision was made for a hearing. Such rules further provide for the attorney general giving notice by registered mail to any organization which the attorney general thereafter proposes to designate as subversive with an opportunity on the part of such organization to file notice of a contest of such proposed designation within ten days of receipt of such registered-mail notice. If the notice so mailed is not delivered by the post-office department, then substituted notice is to be given by publication in the Federal Register, and the organization proposed to be designated as subversive is then given thirty days following such publication within which to file its notice of contest. Such organization is also given the right of a public hearing on such contest of proposed designation.

In addition to these procedural safeguards embodied in the afore-described published rules of the attorney general, the decision of the United States supreme court in *Joint Anti-Fascist Refugee Committee v. McGrath* (1951), 341 U. S. 123, 71 Sup. Ct. 624, 95 L. Ed. 817, unequivocally holds that any organization, which has been designated by the attorney general as subversive is entitled to court review of such designation.

Neither Executive Order No. 9835 nor No. 10450 defines the term *"subversive"* as employed therein. Webster's New International Dictionary (2d ed., unabridged), defines the verb "subvert" as "to overturn from the foundation; to overthrow; to ruin utterly; to destroy; . . ." and defines the adjective "subversive" as "tending to subvert; having a tendency to overthrow, upset, or destroy." On the basis of

these definitions, and keeping in mind the context in which such word appears in these executive orders, we deem that a subversive organization within the meaning thereof is one which advocates the overthrow of the government through force or other unconstitutional means.

While the plaintiffs contend that Resolution 513 and the Gwinn Amendment violate several provisions of the United States and state constitutions, we only find it necessary to consider the alleged violation of the First amendment to the United States constitution. If Resolution 513 violates such amendment it follows as a necessary corollary thereof that it also violates either sec. 3 or 4, art. I of the Wisconsin constitution, or both.

The briefs submitted on this appeal cite but three court decisions which have passed on the constitutionality of requiring tenants of federally aided public-housing projects to execute certificates or oaths of nonmembership in subversive organizations, as a condition of occupancy, and we have been unable to discover any others. Such three cases are *Chicago Housing Authority v. Blackman, supra; Peters v. New York City Housing Authority* (1954), 283 App. Div. 801, 128 N. Y. Supp. (2d) 712, which was reversed on other grounds by the New York court of appeals in *Peters v. New York City Housing Authority* (1954), 307 N. Y. 519, 121 N. E. (2d) 529; and *Rudder v. United States* (Mun. Ct. App. D. C., 1954), 105 Atl. (2d) 741.

The case of *Chicago Housing Authority v. Blackman, supra,* is readily distinguishable from the case at bar upon its facts. The certificate required of tenants by the Chicago Housing Authority did not require certification of nonmembership in a particular list of organizations designated by the attorney general as subversive, and contained no reference to such list, but instead in effect obligated the signer to certify that he was not a member in any subversive organization. The Illinois supreme court held this deprived tenants

of due process of law because the requirement of such a certificate of nonmembership did not distinguish between innocent and knowing membership in a subversive organization, and for that reason held it unconstitutional. The certificate required under Resolution 513 in the instant case does not offend in this respect because the nonmembership referred to therein is specifically limited to a list of organizations designated by the attorney general as subversive, which list is supplied to each tenant coincident to providing him with the certificate of nonmembership he is requested to sign.

The court in *Peters v. New York City Housing Authority,* 283 App. Div. 801, 128 N. Y. Supp. (2d) 712, disposes of the issue relating to possible violation of the First amendment to the United States constitution by the following brief statement in its opinion (283 App. Div. 802, 128 N. Y. Supp. (2d) 714):

"Furthermore, in the present-day context of world crisis after crisis, it is our opinion that the danger the congress is seeking to avoid (*i. e.,* infiltration of government housing by subversive elements) justifies the requirement that tenants herein choose between government housing and membership in an organization they know to have been found subversive by the attorney general. *American Communications Ass'n, C. I. O. v. Douds,* 339 U. S. 382, 70 S. Ct. 674, 94 L. Ed. 925; *Dennis v. United States,* 341 U. S. 494, 71 S. Ct. 857, 95 L. Ed. 1137."

The constitutional issue is passed upon in *Rudder v. United States, supra,* in a single paragraph as follows (105 Atl. (2d) 745):

"In our opinion the Gwinn Amendment was an entirely reasonable exercise of the congressional power. It reflects the wholly salutary view that since low-rent housing projects are subsidized by taxpayers' money, the special benefits thereof shall be available only to loyal tenants, and not to those who elect to join and support organizations whose purposes are inimical to the public welfare. This same view is ex-

pressed in the only appellate decision which has been called to our attention, or which we have been able to find. *Peters v. New York City Housing Authority,* 283 App. Div. 801, 128 N. Y. S. (2d) 712."

We cannot agree that the basis advanced in *Rudder v. United States, supra,* for upholding the constitutionality of the Gwinn Amendment is the same as advanced in *Peters v. New York City Housing Authority,* 283 App. Div. 801, 128 N. Y. Supp. (2d) 712. The New York court justified the resolution of the New York City Housing Authority adopted. pursuant to the Gwinn Amendment on the theory of combating the *"danger"* posed by the threat of the infiltration of government housing by subversive elements. On the other hand, the District of Columbia court in *Rudder v. United States, supra,* seems to sustain the constitutionality of the Gwinn Amendment on the theory that public housing is a privilege which need be made available only to *"loyal tenants."*

The decision of the United States supreme court in *American Communications Asso. v. Douds* (1950), 339 U. S. 383, 70 Sup. Ct. 674, 94 L. Ed. 925, makes it clear that, if Resolution 513 of the defendant Authority is to be upheld against the charge that it invades freedoms guaranteed by the First amendment, it must be upon the basis of combating the threat of danger to the successful operation of public-housing projects which might result from the infiltration of such housing facilities by tenants bent upon the overthrow of the government by force. In that case the court held constitutional the so-called "noncommunist affidavit" provision of the National Labor Relations Act of 1947 (sec. 9 (h) of the Taft-Hartley Act).[5] We quote the following significant passages

---

[5] 61 Stats. at L., p. 146, sec. 9 (h), 29 USCA, sec. 159 (h), provides as follows:

No investigation shall be made by the board of any question affecting commerce concerning the representation of employees, raised by a labor organization under subsection (c) of this section,

from the court's opinion in that case by Mr. Chief Justice
VINSON (339 U. S. 399, 411):

". . . legitimate attempts to protect the public, not from
the remote possible effects of noxious ideologies, but from
present excesses of direct, active conduct, are not presump-
tively bad because they interfere with and, in some of its
manifestations, restrain the exercise of First amendment
rights. [Citing cases.] In essence, the problem is one of
weighing the probable effects of the statute upon the free
exercise of the right of speech and assembly against the con-
gressional determination that political strikes are evils of
conduct which cause substantial harm to interstate com-
merce and that communists and others identified by sec. 9 (h)
pose continuing threats to that public interest when in posi-
tions of union leadership. . . .

"Considering the circumstances surrounding the problem—
the deference due the congressional judgment concerning the
need for regulation of conduct affecting interstate commerce
and the effect of the statute upon rights of speech, assembly,
and belief—we conclude that sec. 9 (h) of the National Labor
Relations Act, as amended by the Labor Management Re-
lations Act, 1947, does not unduly infringe freedoms pro-
tected by the First amendment."

The court's opinion in the *Douds Case* refers to the oft-
cited *"clear and present danger"* test enunciated by Mr.
Justice HOLMES in *Schenck v. United States* (1919), 249
U. S. 47, 39 Sup. Ct. 247, 63 L. Ed. 470, and follows such
reference thereto with this statement (339 U. S. 397):

---

and no complaint shall be issued pursuant to a charge made by a
labor organization under subsection (b) of section 160 of this
title, unless there is on file with the board an affidavit executed
contemporaneously or within the preceding twelve-month period
by each officer of such labor organization 'and the officers of any
national or international labor organization of which it is an affiliate
or constituent unit *that he is not a member of the Communist party
or affiliated with such party, and that he does not believe in, and
is not a member of or supports any organization that believes in or
teaches, the overthrow of the United States government by force
or by any illegal or unconstitutional methods.* (Italics supplied.)

"So far as the *Schenck Case* itself is concerned, imminent danger of any substantive evil that congress may prevent justifies the restriction of speech. Since that time this court has decided that however great the likelihood that a substantive evil will result, restrictions on speech and press cannot be sustained unless the evil itself is 'substantial' and 'relatively serious,' BRANDEIS, J., concurring in *Whitney v. California, supra,* at 374, 377, or sometimes 'extremely serious,' *Bridges v. California,* 314 U. S. 252, 263 (1941). *And it follows therefrom that even harmful conduct cannot justify restrictions upon speech unless substantial interests of society are at stake.* But in suggesting that the substantive evil must be serious and substantial, it was never the intention of this court to lay down an absolutist test measured in terms of danger to the Nation." (Emphasis supplied.)

When the opinion in the *Douds Case* is reviewed in its entirety, the gist of the holding thereof may be summarized as follows: Congress may impinge upon the freedoms guaranteed by the First amendment in order to prevent a substantial evil. No absolute test can be laid down in advance as to when such attempted abridgment by legislation of such freedoms is constitutional, and when not. This necessitates that whenever courts are called upon to pass upon the constitutionality of such type of legislation they weigh the substantiality of the evil sought to be prevented thereby against the harm that will result from the restriction imposed by such legislation upon freedom of speech and assembly. If the evil sought to be prevented is considered to be of sufficient substantiality to warrant the restriction, the legislation will be upheld as constitutional, otherwise not. In weighing the substantiality of the evil sought to be combated, considerable weight is to be accorded to any finding made by congress with respect thereto.

In his opinion in the *Douds Case,* Mr. Chief Justice VINSON emphasized the fact that when congress enacted the Labor Management Relations Act in 1947 it made an express finding to the effect that experience had demonstrated that

certain types of concerted activities by labor organizations impaired the interest of the public in the free flow of commerce and needed to be eliminated. He also pointed out that substantial amounts of evidence had been presented to various congressional committees that communist leaders of labor unions had subordinated legitimate trade union objectives to obstructive strikes to carry out the dictates of Communist party leaders, or in support of policies of a foreign government. The strike called in 1941 at the Allis-Chalmers Manufacturing Company plant in Milwaukee, which was then engaged in producing vital materials for the national defense program, is cited as an example of the type of evidence presented at such committee hearings.

In marked contrast to the foregoing, there is a complete absence of any congressional finding, of any activity of subversive organizations which threatened the carrying out of federally aided housing projects, to support the enactment of the Gwinn Amendment, or of any evidence produced before congressional committees tending to establish the existence of such evil.[6] Counsel for the defendant Authority have failed to point out to this court how the occupation of any units of a federally aided housing project by tenants who may be members of a subversive organization threatens the successful operation of such housing projects.

It is beyond our power to comprehend how the evil which might result from leasing units in a federally aided housing project to tenants who are members of organizations designated subversive by the attorney general is in any way comparable in substantiality to that which would result to the general welfare through communists in control of labor organizations disrupting commerce by calling strikes to carry out Communist party policy. This court deems the possible

---

[6] See "Constitutionality of Denying Federal Housing to Members of Subversive Organizations," 53 Columbia Law Review (1953), 1166, 1170.

harm which might result in suppressing the freedoms of the First amendment outweigh any threatened evil posed by the occupation by members of subversive organizations of units in federally aided housing projects. For this reason we must hold Resolution 513 adopted pursuant to the Gwinn Amendment to be unconstitutional and void.

*By the Court.*—Judgment reversed, and cause remanded with directions to overrule the demurrer.