**UNITED STATES, Plaintiff,**

v.

**Harry SACHER, Defendant.**

**Crim. No. 1216-55.**

United States District Court
District of Columbia.

March 13, 1956.

See also, 139 F.Supp. 853.

---

William Hitz, Asst. U. S. Atty., for the District of Columbia, Washington, D. C., for the United States.

Hubert Delany, New York City, and David Rein, Washington, D. C., for defendant.

HOLTZOFF, District Judge.

This is a trial by the Court without a jury of an indictment charging the defendant Harry Sacher with the offense generally known as contempt of Congress, namely, that he willfully refused to answer certain questions addressed to him as a witness by a Subcommittee of the Committee on the Judiciary of the United States Senate, the function of the Subcommittee being to investigate the administration of the Internal Security Act, and other Internal Security laws, as well as subversive activities.

The indictment charges that the defendant refused to answer questions addressed to him as a witness at a hearing of this Subcommittee on April 19, 1955. The questions are as follows:

"Are you, Mr. Sacher, a member of the Communist Party, U. S. A.?"

"Have you ever been a member of the Communist Party of the United States?"

"Are you now or have you ever been a member of the Lawyers' Section of the Communist Party, U. S. A.?"

The Committee on the Judiciary of the United States Senate is one of its permanent standing committees, and is established by statute as well as by the standing rules of the Senate. By a Resolution of the Senate adopted on December 21, 1950, known as Senate Resolution 366, the Committee on the Judiciary or any duly authorized Subcommittee thereof was authorized and directed to make a complete and continuing study and investigation of (1) the administration, operation, and enforcement of the Internal Security Act of 1950, 50 U.S.C.A. § 781 et seq.; (2) the administration, operation, and enforcement of other laws relating to espionage, sabotage, and the protection of the internal security of the United States; and (3) the extent, nature, and effects of subversive activities in the United Statees, its territories and possessions, including, but not limited to, espionage, sabotage, and infiltration by persons who are or may be under the domination of the foreign government or organizations controlling the world Communist movement or any other movement seeking to overthrow the Government of the United States by force and violence. By a Resolution adopted on March 18, 1955, known as Senate Resolution 58, the creation of this authority of the Committee on the Judiciary was reaffirmed and implemented by powers conferred on the Committee to make certain expenditures and employ certain assistants and consultants.

On January 20, 1955, by a Resolution of the Committee on the Judiciary a special subcommittee to make investigations under Senate Resolution 366 was continued during the 84th Congress, which is the Congress referred to in this indictment. On February 7, 1955, at a meeting of the Senate Committee on the Judiciary a certain number of members of the committee were appointed to this special subcommittee. Among them were Senators McClellan and Jenner. On the same day at a meeting of the Subcommittee a Resolution was adopted providing that a quorum of the Subcommittee for the purpose of taking sworn testimony should consist of not less than two Senators of said Subcommittee. Authority to fix the quorum had been previously granted by Resolution of the full Committee.

The proof shows that on April 19, 1955 at a hearing conducted by the Subcommittee at which a quorum was present throughout, consisting of Senator McClellan and Senator Jenner, the defendant was called and sworn as a witness. He was asked a number of questions, among them the three questions involved in this case.

As to these questions the transcript of the hearing shows that the following proceedings took place.

He was questioned by Mr. Sourwine, the general counsel of the Committee:

"Are you, Mr. Sacher, a member of the Communist Party, U. S. A.?"

The defendant declined to answer, giving a rather long explanation for his action, the pertinent parts of the explanation being as follows:

"I refuse. I refuse categorically, Mr. Chairman, to discuss my beliefs, religious, political, economic or social. I do not do so on the ground of the Fifth Amendment. I do so because it is inconsistent with the dignity of any man to be compelled to disclose his political, religious, economic, social, or any other views. And I respectfully submit that an inquiry to me concerning this matter is not pertinent to anything with which this committee is concerned, and is not relevant to any inquiry that may properly be made of me. And I, therefore, decline on the ground that I cannot with any regard for my own self respect, do otherwise, Mr. Chairman."

Senator McClellan, who was presiding, then repeated the question:

"Are you now a member of the Communist Party of the United States?"

The defendant responded:

"And I decline to answer that question, Mr. Chairman."

Senator McClellan, "The Chair orders you to answer the question."

The defendant again said:

"I decline to answer that question on the ground I have already stated."

Then the Chairman asked the defendant the second question involved in this case:

"Have you ever been a member of the Communist Party of the United States?"

The defendant's reply was:

"I respectfully submit, Mr. Chairman, that my conscience dictates to me that I shall not, under your compulsion or anybody else's compulsion, make any disclosure of any of my beliefs, political, religious, economical, or social, past or present, and I decline to answer your question."

Senator McClellan. "The Chair orders you to answer the question."

Mr. Sacher. "I respectfully decline to answer it."

Then the general counsel of the committee asked the third of the questions involved in this case:

"Are you now or have you ever been a member of the Lawyers' Section of the Communist Party, U. S. A.?"

The defendant's reply was:

"Mr. Chairman, I have declined before and I decline again."

Senator McClellan. "You are ordered to answer the question."

The defendant stated:

"On the grounds that I have already stated so I need not take the time of the committee, and I reemphasize that there is nothing in the purposes of the committee or the Congress which comprehends the validity, the pertinence or the relevancy of an inquiry to me concerning my political beliefs or affiliations. I respectfully decline to answer that question."

In each instance the question was asked, the witness declined to answer, and then he was directed to answer. Hence it is clear that the Committee did not acquiesce in the refusal. Consequently the procedure prescribed in Quinn v. United States, 349 U.S. 155, 75 S.Ct. 668, 99 L.Ed. 964, has been followed and its requirements complied with.

The only question that is being contested in this case is whether the Subcommittee had the right to ask these questions of the witness. That general subject must be subdivided into several parts. First: Was the subject of investigation of Communism within the legislative function of the Congress? Obviously the answer is in the affirmative. The Congress has legislated on the subject of Communist activities and other activities tending to overthrow the Government by force and violence, as for example, in the Smith Act, 18 U.S.C.A. § 2385. This aspect of the matter does not require prolonged discussion. The legality of the creation of the Committee on Un-American Activities of the House of Representatives has been often con-

tested, but the contest has always been resolved in favor of the Committee. The same principles are applicable to the Internal Security Subcommittee of the Senate Committee on the Judiciary.

The next aspect that must be considered is whether this particular matter was within the jurisdiction of the Committee, which is a different question than whether the general subject was within the legislative power of the Congress. Here again the question must be answered in the affirmative, because by Senate Resolution, investigation of the enforcement of the Internal Security Act, laws relating to espionage, sabotage, and the protection of internal security, and of subversive activities generally was reposed in the Committee on the Judiciary, which was clothed with the necessary power. The Committee on the Judiciary in turn delegated that authority, as it had a right to do under the Resolution, to its Subcommittee on Internal Security.

■ This brings us to the question whether the specific questions were pertinent to the inquiry. It is well established, of course, that in order to constitute a contempt of the Congress punishable under the statute, a refusal to answer queries must relate to topics that were pertinent to the inquiry that the Committee or Subcommittee was lawfully conducting. That the general subject concerning which the Committee was inquiring was within its jurisdiction has already been indicated. The Court of Appeals has held that the Government has the burden of establishing the pertinency of the questions. But it must be borne in mind in this connection that the common law rules of evidence that prevail in the courts are not binding on Congressional Committees and in fact have no place in hearings conducted by Congressional Committees. Technical relevancy as known at common law is not, therefore, the test. The terms "pertinency" and "relevancy" are used in the sense of being germane to the subject into which inquiry is being made.

■ Primarily it is the Committee or the Subcommittee conducting the hearing that must make the decision whether a particular question is germane to the inquiry and whether the information sought would be helpful. The decision of the Committee must be given considerable weight. Necessarily, it is subject to Court review, when an attempt is made to prosecute the witness for refusing to answer a question propounded to him, but the decision of the Committee that the question is pertinent, and the direction that the question be answered, will not be lightly set aside.

■■ The Court is of the opinion that the question of pertinency of a particular interrogatory addressed to a witness has two aspects or may be approached from two different angles. There are some questions which are pertinent on their face, and their very text is sufficient to establish their pertinency. There are other questions whose pertinency does not appear except by extrinsic evidence. The Court is of the opinion that the questions involved here are pertinent on their very face. Whether a person is a member of the Communist Party or of the Lawyers' Section of the Communist Party is obviously pertinent to an inquiry into activities to overthrow the Government by force and violence, because it has been held by the Supreme Court of the United States that the Communist Party is inherently an organization that seeks to accomplish this very aim. Consequently, even if the Government offered no evidence on the issue of pertinency this Court would hold and does hold that these questions are pertinent on their face.

The Government, however, has gone further in a commendable exercise of caution and submitted evidence showing the reasons for the inquiries, their specific pertinency to the subject matter that the Subcommittee was investigating, and the reasons for addressing these questions to the witness. The Subcommittee was investigating subversive activities. Testimony has been introduced that the Subcommittee had information in its

files that the defendant had been a member of a number of subversive or Communist front organizations; that he had been a member of the International Labor Defense which was known or believed to be supported by the Communist Party; that he participated in Communist meetings generally. Moreover, the Committee wanted to know whether he participated in what the Committee believed were efforts of the Communist Party to discredit Government witnesses in cases involving Communists. This aspect of the matter arose in connection with one Matusow, who had been a Government witness in a prosecution under the Smith Act, and who later recanted his testimony.

It must be emphasized that all of this testimony was hearsay and would be incompetent and inadmissible if it had been tendered as proof of the facts therein referred to. This testimony, however, was neither offered nor admitted for that purpose. It was admitted for the sole purpose of establishing the pertinency of the questions addressed to the witness. This testimony tended to indicate the subjects in which the Committee was interested, why it was interested in those subjects, and how the questions asked of the witness related to those subjects. Obviously, hearsay testimony, although not proof of the facts to which it relates, may sufficiently establish and is admissible to establish pertinency of the questions here involved and the reasons for asking them. To take an analogy out of a different field of law, reasonable ground for obtaining a warrant of arrest may be shown by hearsay information, although such information would not be admissible to prove the offense charged in the warrant.

■ The defendant claims that what the Committee was investigating was the witness Matusow who had recanted and changed his testimony in a pending case, and the defendant further contends that to make such an investigation was an encroachment on the judicial power. The Court is of the opinion that this argument involves a non sequitur, for two reasons. In the first place, contrary to the defendant's contention, the Matusow aspect of the investigation conducted by the Subcommittee was only one of the many subjects then under scrutiny and was not the sole topic in which the Committee was interested. Moreover, while the Congress has no right to retry a case that is tried in a court, and no one is more assiduous in preserving the independence of the judiciary and guarding it against encroachment than this Court, nevertheless, a distinction must be drawn between an attempt to retry a case and an inquiry whether some proceedings in the case were part of an organized conspiracy to discredit Government witnesses in a series of cases as to which legislation might be possible. It may be added in passing, although it is not necessary, that this investigation did result in the drafting and the introduction of a bill on the subject of practice of law by lawyers who are members of the Communist Party. While it is not necessary to establish the existence of such a measure, that the inquiry did result in the introduction of such legislation is a conclusive demonstration of the fact that the investigation was in aid of legislation and not for any ulterior motive or some purpose in respect to which the Congress had no authority to act.

■ The suggestion raised in the argument of the defendant's counsel, and advanced by the defendant in a general way, that he is protected by the First Amendment against being required to answer the questions is fallacious. The First Amendment relates to freedom of speech, freedom of the press, and freedom of religion. It guarantees to every person the right to speak, subject of course to certain qualifications. It guarantees freedom to the press. It guarantees to every person the right to worship God in his own way, or not to worship Him at all. There is nothing in the First Amendment, however, which provides, directly or indirectly, that a per-

son who is a witness or is otherwise being legally questioned may not be interrogated concerning matters covered by his freedom of speech, freedom of the press, or freedom of religion. There are many illustrations that may be cited in support of this thought. For example, on a voir dire examination of jurors during the impaneling of a jury questions are often asked concerning personal views and personal beliefs of the jurors, and such questions are permitted if they are relevant and germane. A juror may not refuse to answer them on the ground that he was protected by the First Amendment. I suppose in connection with the census the Congress might direct the Census Bureau to conduct a religious census in order to find out how many members there were in different denominations, and if the Congress did so a person could not decline to answer the question on the basis of the First Amendment to the Constitution. In other words, freedom to hold any political views or any religious views does not include the right to refuse to state what those views are. Obviously, those views may not be inquired into except by lawful authority, and only when they are pertinent, but when it is done under these circumstances there is no right to refuse to answer.

■ It has been urged that this proceeding is an infringement on the rights and the duties of members of the bar to defend the accused. The right and the duty of a member of the bar to defend the accused in a criminal case is and must be recognized by law. It is part of the traditional function of the bar. The Constitution provides that every person accused of a crime is entitled to counsel. In order to effectuate this constitutional guarantee it is necessary to extend full and unquestioned freedom to every member of the bar to accept a retainer in any criminal case and defend the accused. But this right stops where the duty and the function of the advocate or the counsel ceases. It is entirely proper to inquire into the activities of a member of the bar that are beyond the legal and ethical scope of his duties as counsel. It is entirely proper to inquire into his activities or connections with his clients that are beyond merely representing them in court. In this case the defendant was not questioned concerning his retainer, or concerning his representation of his clients. Consequently the appeal to the ethics of the bar is out of place. He was interrogated whether he personally was a member of the Communist Party; whether he personally had ever been a member of the Communist Party; and whether he personally was or had ever been a member of the Lawyers' Section of the Communist Party. These questions had no bearing on his work for his client.

■ Finally we come to the question whether willfullness in the refusal to answer has been established. It has always been held beginning with the Sinclair case, Sinclair v. United States, 279 U.S. 263, 49 S.Ct. 268, 73 L.Ed. 692, and ending with the recent Quinn case in the Supreme Court and in the Fields case, Fields v. United States, 82 U.S.App.D.C. 354, 164 F.2d 97, in this jurisdiction that a refusal to answer in order to be punishable must be willful. Willfullness does not mean bad faith or an evil motive. By willfullness in this connection, as the authorities have established, is meant that the refusal was deliberate and intentional and not merely accidental or inadvertent.

The Court is of the opinion that the Government has established all of the elements of this charge beyond a reasonable doubt and finds the defendant guilty on each of the three counts.