Merrimack,
No. 4533.

LOUIS C. WYMAN, *Attorney General*

*v.*

WILLARD UPHAUS.

Argued December 4, 1956.

Decided February 28, 1957.

*Louis C. Wyman,* Attorney General (by brief and orally), *pro se.*

*Royal W. France* (of New York) and *Nighswander, Lord & Bownes* (*Mr. France* and *Mr. Bownes* orally), for the defendant.

PER CURIAM. New Hampshire World Fellowship Center, Inc.

is a New Hampshire corporation which maintains accommodations for the public at Albany, New Hampshire, during the summer season. By means of a sign near the highway the public is invited to stop there at specified rates. The defendant, a native of Indiana and resident of New Haven, Connecticut, has been executive director of the Center since 1953. He described the Center thus: "The World Fellowship of Faiths is a religious-motivated movement in the highest sense which seeks to bring together for fellowship and discussion the representatives of all faiths to the end that there may be peace, brotherhood and plenty for all men, women and children. It is a movement world-wide in its purpose."

In the course of interrogation by the Attorney General, both privately and before the Court, the defendant furnished the names of persons who spoke or conducted discussions at the Center in the course of the 1954 and 1955 seasons. Some twenty persons, all nonresidents, were named by the witness as speakers in 1954, and over twenty-eight as speakers in 1955, a number of the latter being persons who had spoken in 1954. Information in the possession of the Attorney General concerning some of these persons and their connection with organizations or agencies considered to be communist-influenced or controlled, was contained in his report to the 1955 Legislature, which was before the Trial Court. Attorney General's Report on Subversive Activities in New Hampshire, 1955, *pp.* 136-156. Likewise, information concerning the defendant's connections with and support of similar organizations was before the Court in the same report. *Id., pp.* 162-175.

The defendant in the course of the proceedings has placed no reliance upon the Fifth Amendment to the Constitution of the United States, or the Fifteenth Article of the New Hampshire Bill of Rights. He testified that he was not a Communist and never had been, and that none of the speakers at the Center, or its guests, were to his knowledge Communists, although he was aware of the connections held by many of them and frankly conceded his own activities in past years. He testified that at no time at the Center was there any advocacy of overthrow of the Government by force or violence. A teacher by profession, and holding a Ph. D. degree in religious education from Yale, he described himself as a pacifist, and believer in a "form of Christian social society."

The witness testified that the Center could accommodate a maximum of sixty persons for a meal, and that the guest register

for the 1954 season consisted of approximately three hundred sixty names and addresses, upon three by five cards, kept by him "in an office" in New Haven. He testified that the register for 1955, similarly kept, consisted of about two hundred fifty names and addresses up to August 31, 1955, and "something over three hundred" for the summer. In refusing to produce the registrations, the witness characterized the inquiries of the Attorney General as an "attempt . . . to harass and intimidate me and to destroy the work of the World Fellowship of Faiths" and "a direct invasion of Christian conscience, an authority higher than that of the State." He refused upon the ground of conscience to give the names and addresses "of people who, to my knowledge, have never done anything to injure their country and who came to World Fellowship Center solely for vacation, recreation and friendly discussions"; because to do so "would turn [him] into a contemptible informer" and he could not "involve innocent people in the Attorney General's network." Specifically he relied upon the First and Fourth Amendments to the Constitution of the United States and Articles 4th, 5th and 19th of the New Hampshire Bill of Rights.

In this court, the defendant has relied upon the same constitutional provisions. He contends that the investigation is unconstitutional and invalid by reason of the decision of the United States Supreme Court in *Pennsylvania* v. *Nelson*, 350 U. S. 497. He further contends that the information sought by the petitioner has not been shown to be relevant or pertinent to the subject of the investigation, that information before the Trial Court was incompetent because hearsay, and that the order committing him until he should purge himself of his contempt is invalid because indefinite and constituting cruel and unusual punishment. Constitution of the United States, Amend. VIII.

I. We are confronted at the outset by the contention that the investigation is shown to be invalid by the decision of the United States Supreme Court in *Pennsylvania* v. *Nelson, supra.* The same contention was advanced without success on motion for rehearing in *Wyman* v. *Sweezy*, 100 N. H. 103, and was strongly urged in *Kahn* v. *Wyman*, 100 N. H. 245. In the latter case, after full consideration the opinion was expressed that *Pennsylvania* v. *Nelson, supra,* did not preclude conduct of the "investigation of subversive activities within the state as distinct from . . . the prosecution of crimes." See also, *State* v. *Raley,* (Ohio App.)

136 N. E. (2d) 295, 307. We see no present reason to recede from the views previously expressed.

In this connection it may be of interest to note that courts of other jurisdictions which have thought it necessary because of the *Pennsylvania* decision, *supra,* to dismiss prosecutions charging offenses against the State as well as the federal government have done so with reservation of the possibility that some "kind of sedition [might be] directed so exclusively against the State as to fall outside the sweep of . . . *Pennsylvania* v. *Nelson.*" *Commonwealth* v. *Gilbert,* (Mass.) 134 N. E. (2d) 13, 16. See also, *Braden* v. *Commonwealth,* (Ky. App.) 291 S. W. (2d) 843, 844.

The circumstance that the usefulness of the investigation authorized by the resolutions of 1953 and 1955 has been diminished by the holding of the *Pennsylvania* case does not preclude continuance of the investigation for any purposes which may remain open. See 70 Harv. L. Rev. 95, 119, and footnote 148; Note, 31 Ind. L. J. 270, 281-285. The defendant's argument that the investigation is invalid cannot be adopted.

II. The witness Uphaus contends that the record fails to establish the relevancy of the evidence sought and ordered to be produced. It is fundamental that "the power exercised by a committee . . . must be within both the authority delegated to it and also within the competence of the [legislative body] to confer upon the committee." *United States* v. *Lamont,* 18 F. R. D. 27, 33, *aff'd* 236 F. (2d) 312. Although as a result of *Pennsylvania* v. *Nelson, supra,* the State is without authority to prosecute offenses against the federal government, the power to investigate to determine "whether subversive persons as defined in said [1951] act are presently located within this state" and whether "necessary legislation" should on that account be recommended (*Id.*) remains unimpaired. In this connection it may be well to observe that any questions of policy regarding this legislation are not for the court but belong exclusively to the Legislature and this distinction we are bound to respect. *Chronicle &c. Pub. Co.* v. *Attorney General,* 94 N. H. 148, 151. If through its legally authorized committee, the Attorney General (*Wyman* v. *Sweezy,* 100 N. H. 103, 105), the Legislature has asked for relevant information it is entitled to it. The test to determine whether the question is relevant is to inquire whether "the question is directed at a *possible* answer . . . which would be reasonably concerned with the main object of the investigation." *Wyman* v. *Sweezy, supra,* 106. (Emphasis supplied).

To establish relevancy in the case before us, the petitioner relied substantially upon the content of Uphaus' answers, and the information concerning him and speakers at the Center which is summarized in the report to the 1955 Legislature hereinbefore cited. The witness objected to the latter information as hearsay and incompetent. This objection has not been strongly urged before us and we have already rejected this argument in *Wyman* v. *Sweezy*, *supra*, decided since the hearings of the Attorney General in this case were held. The petitioner is clearly entitled to act upon "reasonable or reliable" information (Laws 1953, *c*. 307) which he may present to the Court, even though in hearsay form to establish the relevancy of his inquiry. *Wyman* v. *Sweezy*, *supra*, 111. As was observed in *United States* v. *Sacher*, 139 F. Supp. 855, 860, in considering a similar objection: "Obviously hearsay testimony . . . may sufficiently establish . . . pertinency of the questions here involved and the reasons for asking them."

The witness refuses to produce the guest registrations of World Fellowship, claiming in effect that they cannot *possibly* be reasonably concerned with "whether subversive persons . . . are presently located within this state." Laws 1953, *c*. 307. In determining the worth of this objection it appears necessary to detail some of the information disclosed by the record as being in the Attorney General's possession and bearing on whether the question as to the guest cards was relevant, since the context in which a question is asked may "indicate its relevancy." *Wyman* v. *Sweezy*, *supra*, 107.

It appears that the witness was a supporter of numerous organizations on the subversive list prepared by the House committee and was ousted in 1950 from the National Religious and Labor Foundation because, without its consent, he participated in Communist front activities. He attended the Warsaw Congress, which he said he knew was "Soviet influenced," at the invitation of a man whom he admittedly knew had an international reputation as an open Communist. At this Congress the United States was attacked for allegedly using germ warfare in Korea.

Not less than nineteen speakers invited by Uphaus to talk at World Fellowship had either been members of the Communist Party or had connections or affiliations with it or with one or more of the organizations cited as subversive or Communist controlled in the United States Attorney General's list. His attorney asserts that the witness is "not at all concerned about his associations." In

this connection it may be noted that throughout the examination of Uphaus the latter dwelt at length on the high ideals of his organization and his love for and belief in freedom. It is not for this court to pass on the truth of these representations. The committee was at liberty unquestionably to believe the witness. On the other hand, it was equally free to decide that Lord Salisbury's famous dictum might be applicable: "If you will study history, you will find that freedom, when it has been destroyed, has always been destroyed by those who shelter themselves under the cover of its forms, and who speak its language with unparallel eloquence and vigor."

In many instances Uphaus knew that the speakers at World Fellowship were members of one or more organizations cited as subversive by the United States Attorney General, but he claimed he did not know whether they or such persons as Paul Robeson with whom at times he had had correspondence, were Communists. However this may be, we have already held that whether persons "were or were not in fact Communist Party members or subversive persons is not decisive on the issue of relevancy." *Wyman* v. *Sweezy, supra,* 112. The Attorney General did not have to prove them Communists or subversives before he asked questions which were directed at a possible answer which would be "reasonably concerned with a main object of the investigation." *Id.,* 112. It is equally true that the Attorney General was not required to prove that World Fellowship was a subversive organization before making inquiry concerning it. *Id.,* 112.

Literature was distributed at the World Fellowship Center, examples being such material as a pamphlet by Molotov on Soviet policy and another on American-Russian friendship, the opening line of which was "Back to Stalingrad." However, as Mr. Uphaus himself said, it made no difference to him whether his guests believed in Communism or not. "It depends on his conduct while he is there" whether he is permitted to remain. The witness admits that he has had correspondence with persons who have been reputed or alleged to be Communist Party members. He also concedes that he said "a grace" which contained the following words, "God bless the revolution," but he claims this referred to "any revolution." As previously noted, belief in his statement was not compelled. A book available at the Center entitled "World Fellowship of Faith," contained an article which after supporting Communism reads: "If any government stands in the way that government

must be overthrown." And again, there was a statement to the effect, "If any people stand in the way, that people must be destroyed; . . . we must banish God from the skies and capitalists from the earth." The witness denies that he subscribes to "everything" in this publication.

In the light of this information and in this setting, Uphaus maintains that the guest registrations of World Fellowship cannot *possibly* contain any information bearing on whether, at the time of the investigation, subversive persons were "located within this state." *Wyman* v. *Sweezy*, 100 N. H. 103, 106. We believe this contention so unrelated to reality that it requires no further answer than the above recital of some of the information possessed by the Attorney General and the law applicable to the situation. Other authorities have reached the same conclusion in similar circumstances. See *Flaxer* v. *United States*, 235 F. (2d) 821; *Marshall* v. *United States*, 176 F. (2d) 473; *Morford* v. *United States*, 176 F. (2d) 54.

The case of *Rumely* v. *United States*, 197 F. (2d) 166, relied upon by the witness, so far from being an authority for his position, appears upon analysis to support the State's contention. In the *Rumely* case the investigation was concerned with lobbying and the question was whether a publisher of books must disclose the names of those who purchased them. The Court held that he did not have to and that the effort to influence public opinion upon national affairs was a protected freedom of speech which Congress could not abridge "unless urgent necessities in the public interest require it to do so." *Id.*, 173. The opinion went on to assert that *"on the contrary," Communism poses a threat to* "the security of this country," and for that reason Congress had *"the power, and a duty,* to inquire into Communism and the Communists." *Id.*, 173, citing *Barsky* v. *United States*, 167 F. (2d) 241, *cert. denied*, 334 U. S. 843. (Emphasis supplied.)

In passing it may be well to note in commenting on the stress which the *Rumely* case lays on the "urgent necessity" of investigating Communist activities as balanced against the right to freedom of speech, which the witness contends is controlling here, that our Legislature, in common with the federal government and most other states, has found this necessity exists to a degree so urgent, and has given the reasons so cogently, that it seems unnecessary to revert to them again, even in the most summary fashion. It may also be worth considering that for many years

guest registrations in public places such as World Fellowship have been open to inspection "at all times" by "the sheriff or his deputies and to any police officer." RSA 353:3. So far as appears in this state, no one has ever questioned the validity of such a law until the Communist issue arose.

In conclusion, we believe that the Legislature through its lawfully authorized committee, the Attorney General, has demanded clearly relevant information. We hold it is entitled to it. Accordingly, the order of the Superior Court requiring the witness to produce the guest registrations is sustained and his exception is overruled.

III. The Trial Court transferred without ruling the "question of an order requiring the production of all correspondence with or concerning persons who presented speeches, addresses, panel discussions or topics at World Fellowship Inc. during the 1954 and 1955 seasons." The petitioner made it apparent at the trial that the subpoenas were intended to require production of correspondence conducted during the specified years only.

The witness testified that in 1954 there was correspondence with some fifteen to twenty persons, and that correspondence was conducted in 1955 with certain specified speakers. He testified that there "was never," in any of the correspondence, "anything suggesting that they discuss the overthrow of government by force or violence, or any topics relating to the overthrow of government by force and violence, or that they discuss Marxism or Leninism." He declined to produce the requested correspondence, relying upon the defense of irrelevancy, and of violation of the First, Fourth, and Fourteenth Amendments to the Constitution of the United States, and Articles 4th, 5th and 19th of the New Hampshire Bill of Rights.

As was pointed out in *Wyman* v. *Sweezy, supra,* the legislative committee was not bound to accept the assurance of the witness that the correspondence in question contained nothing relevant. "The witness could not by his answer impose upon the investigating committee the burden of producing evidence that a doctrine aimed at the violent overthrow of government was in fact advocated by him before it could inquire of him concerning the lecture." *Id.,* 108.

The defendant vigorously objects to use made of the list of organizations cited by the United States Attorney General as subversive or communist-controlled. Reliance is placed by him upon various holdings of the courts, establishing that connection with organizations so listed is not proof of guilt of subversion. We

recognize that such a listing of itself establishes neither the character of the organization nor of persons associated with it. *Anti-Fascist Refugee Committee* v. *McGrath,* 341 U. S. 123; *Barsky* v. *Board of Regents,* 347 U. S. 442, 456, 460. See also, *Wieman* v. *Updegraff,* 344 U. S. 183; *Shachtman* v. *Dulles,* 225 F. (2d) 938, 943; *Lawson* v. *Housing Authority,* 270 Wis. 269; *Application of Hughes,* 141 N. Y. S. (2d) 392.

The question under our statute is not whether the listing by the Attorney General, admittedly hearsay as used in these proceedings, is competent evidence upon which the rights of individuals to employment or housing may be made to depend, but whether it constitutes information which the legislative committee may consider so far "reasonable or reliable" as to warrant further inquiry concerning the persons affected. The information in the petitioner's possession, including the listing by the Attorney General of organizations with which the defendant and speakers at the Center had connections, could be found sufficiently reasonable or reliable to warrant further inquiry concerning their relationship with each other and their activities at the Center.

The possibility that the correspondence which it is sought to have produced may yield no information tending to show subversive purposes is not determinative of the relevancy of the request for its production. As was pointed out in *United States* v. *Orman,* 207 F. (2d) 148, 154, 155, the question of relevancy turns upon the substance of the question, and the possibility that the answer may be relevant, rather than upon the actual character of the answer when obtained. "Although his responses might have proved that he was not, [linked with unlawful activity] it was not his right to deny this knowledge to the Committee." *Id.,* 155. See also, *Wyman* v. *Sweezy, supra,* 106, 112. We conclude that an order for production of the correspondence would not be invalid upon the ground that inquiry concerning it could not be found relevant.

The question remains whether such an order would violate constitutional rights under the First Amendment to the United States Constitution, or under the Fourth Amendment guaranteeing the right to be secure against "unreasonable searches and seizures," the former of which at least becomes applicable to state action by reason of the Fourteenth Amendment (*Gitlow* v. *New York,* 268 U. S. 652, 666); or rights, under the state Constitution, "of Conscience" (*Art.* 4th), of religious freedom (*Art.* 5th), and "to be secure from all unreasonable searches and seizures" (*Art.* 19th).

We are of the opinion that the order would not violate such rights as a matter of law. By public exposition of their views, the defendant and the speakers in question chose overtly to place their views in the public eye. As against the expressed public interest in learning the nature and purposes of these expositions, based upon reasonable ground for believing that they may have been subversive in character, the witness or the speakers may not now enshroud their purposes in a cloak of the "freedom of silence." See 47 Mich. L. Rev. 181, 213-222. Their right is to be free from "unreasonable" searches and seizures; and disclosure of the contents of their correspondence, like disclosure of the content of the witness Sweezy's lecture, may be compellable in the interest of satisfying the public need for disclosure of circumstances reasonably thought to be concerned with the object of the legislative investigation. *Wyman* v. *Sweezy, supra,* 106-109.

It is not to be disputed that the right to be exempt from arbitrary disclosures of personal and private affairs has always been regarded as of great importance. *Sinclair* v. *United States,* 279 U. S. 263, 292. See also, *Boyd* v. *United States,* 116 U. S. 616, 621-622. An order for the production of papers under a subpoena *duces tecum* may constitute an unreasonable search and seizure. *Hale* v. *Henkel,* 201 U. S. 43, 76. But one which requires the production of relevant documents in furtherance of an authorized investigation is not such a search and seizure. See *United States* v. *Orman,* 207 F. (2d) 148, 158. It is the "unjustifiable intrusion" which violates the Fourth Amendment. See *Brandeis,* J., *dissenting,* in *Olmstead* v. *United States,* 277 U. S. 438, 478-479.

The principal issue with respect to the order sought in this case is whether production of the correspondence is relevant (*United States* v. *Orman, supra,* 158), and within reasonable and definite limits. *Oklahoma Press Pub. Co.* v. *Walling,* 327 U. S. 186, 196, 202-214. It might be thought that production of all correspondence requested, whether or not relating to proposed speaking engagements at the Center, would exceed the bounds of relevancy. On the other hand correspondence not directly concerned with such an engagement might be thought relevant to show the defendant's acquaintance with the speakers and their views and to shed light upon the probable nature of their discussions at the Center, some of which, according to the defendant, consisted merely of telling "stories of their lives, their interests, and their problems." We therefore consider that an order to produce the

correspondence specified by the subpoena could be found warranted by the record and would not be precluded as in violation of constitutional rights. *Barsky* v. *United States,* 167 F. (2d) 241; *United States* v. *Orman, supra.*

The atmosphere of religion which surrounds the defendant's activities does not necessarily insulate them from investigation. The petitioner voices a purpose "to show that the advocacy of this so-called peace crusade is for the purpose of achieving a quicker and a cheaper occupation by the Soviet Union and Communism." Only by investigation of these activities can it be determined whether their purpose is what the committee claims, or whether the organization of which the defendant is director is in fact "an organization the *bona fide* purpose of which is to promote world peace . . . through constitutional means" which the statute excludes from the definition of a "foreign subversive organization" (RSA 588:1), and which the defendant claims the World Fellowship Center to be.

The exception to denial of the motion to dismiss is overruled. Upon remand the Trial Court may exercise its discretion with respect to the entry of an order to enforce the command of the subpoena for the production of correspondence.

IV. Finally the argument of the defendant that the order of committal for contempt constitutes an "indeterminate sentence" which is invalid because "cruel and unusual punishments" (Const. of the U. S., Amend. VIII; N. H. Const., Pt. I, *Art.* 33rd) merits brief consideration. The function of the order entered below was not punishment in vindication of the public interest, but coercion to compel compliance with the prior order of the court to produce the registrations. *Penfield* v. *S. E. C.,* 330 U. S. 585, 593. See also, *United States* v. *United Mine Workers,* 330 U. S. 258, 293, 302; *Yates* v. *United States,* 227 F. (2d) 844. Consequently statutes regulating the imposition of sentences for crime are inapplicable. The committal ordered is terminable upon the witness purging himself of contempt, and is not considered violative of the constitutional provisions relied upon by the defendant.

*Remanded.*

DUNCAN and GOODNOW, JJ., dissented in part.

DUNCAN, J., *dissenting* in part: I concur in all of the foregoing

opinion, except section II thereof. In my judgment the order requiring the defendant to produce the guest registrations should be vacated, and I therefore dissent from section II of the opinion for reasons hereinafter expressed.

As a result of *Pennsylvania* v. *Nelson*, 350 U. S. 497, the investigation authorized by the Legislature of this state is now limited to investigation of the question of "whether subversive persons as defined in said [1951] act are presently located within this state" (Laws 1953, c. 307) and whether "necessary legislation" should on that account be recommended. *Id.* The right of the committee "to exact testimony and to call for the production of documents must be found in this language." *United States* v. *Rumely*, 345 U. S. 41, 44. See also, *United States* v. *Kamin*, 136 F. Supp. 791; *United States* v. *Lamont*, 236 F. (2d) 312. The inquiry must therefore be pertinent to the issue of whether subversive persons "are presently located within this state" if it is to be permitted.

The committee's demand for production of the guest registrations was supported by no claim of information in the possession of the committee concerning the guests (other than speakers) to indicate that their identification by name might relate to the subject matter of the investigation. *Cf. Wyman* v. *Sweezy*, 100 N. H. 103, 112. The demand rested only upon the testimony of the witness as to the total number of guests for each season, in the course of which he stated that "very few" of the guests came from the State of New Hampshire.

In *Wyman* v. *Sweezy, supra,* it was pointed out that a question may not be sustained as relevant "on a mere possibility that it might lead to later relevant questions" (*Id.,* 106); and that the resolution authorizing the investigation "does not . . . authorize [the Attorney General] to examine private citizens indiscriminately in the mere hope of stumbling upon valuable information." *Id.,* 110. The information sought by the committee is not limited to the names of guests resident here (*Cf. Rumely* v. *United States,* 197 F. (2d) 166, 176) nor is it represented that the names cannot be obtained by less objectionable methods (see *Dennis* v. *United States,* 341 U. S. 494, 542; note, 56 Col. L. Rev. 798, 801), or that production of the registrations may show the activities of the Center to be subversive. The conduct of the guests does not fall within the same category as that of the defendant and speakers at the Center, which has consisted of public endorsement and advocacy

of ideas; and no suggestion has been made that by mere presence at the Center the guests became members of any organization, or advocated any action, lawful or otherwise. The committee seeks to know "who was there," in order by further examination to "find out what went on."

In view of the restricted purpose of the investigation, which is more closely confined than the purposes of the congressional investigations with which the cases relied upon by the majority were concerned, production of the registrations is at best only a diffused and remote approach to the issue of whether subversive persons are "presently located" in New Hampshire, and can of itself become relevant only when coupled with other relevant information concerning the guests which is not shown to be at hand. See *United States* v. *Mathues*, 33 F. (2d) 261; *United States* v. *Barry*, 29 F. (2d) 817; *Bowers* v. *United States*, 202 F. (2d) 447. See also, *Watkins* v. *United States*, 233 F. (2d) 681, 694. "It is clear that authority over a subject matter does not import authority over all activities of persons concerned in that subject matter." *Rumely* v. *United States*, 197 F. (2d) 166, 176.

Enforcement of the subpoena goes beyond the inquiry held relevant in *Wyman* v. *Sweezy, supra*. It calls for the names of persons largely nonresident who assembled at different times, ostensibly to discuss topics of religious, political, and economic import. The "possible answer" will not of itself be concerned with the "main object of investigation." (*Id.*, 106).

The order of the Court will operate as a deterrent upon the right of free speech and peaceable assembly guaranteed by the Constitution. *Wyman* v. *Sweezy, supra*, 113. See *Edgerton, dissenting, Barsky* v. *United States*, 167 F. (2d) 241, 254. Constitutional rights of the guests as well as of the witness are involved, and the Court need not restrict itself to consideration of the rights of the witness alone. See *Barrows* v. *Jackson*, 346 U. S. 249; *Anti-Fascist Refugee Comm.* v. *McGrath*, 341 U. S. 123, 187; Comment: Inquiry Into Political Activity, 65 Yale L. J. 1159, 1183-1189. The role of the guests with respect to the subject matter was not essentially different from that of the purchasers of pamphlets pertaining to national issues in the *Rumely* case *supra*. "On a record such as this, so slim a semblance of pertinency is not enough to justify inquisition violative of the First Amendment." *Rumely* v. *United States*, 197 F. (2d) 166, 172. See also, *United States* v. *Rumely*, 345 U. S. 41, 46.

The record does not disclose such a public necessity for production of the registrations as to warrant abridgment of the privilege of the individuals concerned to exercise their civil liberties free from threatened involvement in the legislative investigation of subversive persons.

I am authorized to state that *Goodnow*, J., concurs in this dissent.