Curtis HOLT, Sr. and May Holt, Plaintiffs,

v.

RICHMOND REDEVELOPMENT AND HOUSING AUTHORITY

and

T. G. Edwards, Project Manager, Defendants.

Civ. A. No. 4746.

United States District Court E. D. Virginia, Richmond Division.

Sept. 6, 1966.

S. W. Tucker, Henry L. Marsh, III, Willard H. Douglas, Jr., Richmond, Va., for plaintiffs.

Olin A. Rogers, Rogers, Cudlipp & Gwathmey, Richmond, Va., Walter E. Rogers, Williams, Mullen & Christian, Richmond, Va., for defendants.

BUTZNER, District Judge. (from the bench)

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Curtis Holt, Sr. and May Holt, his wife, brought this action praying for an injunction restraining the defendants from evicting them and their family, from taking any action which denied to the plaintiffs or others similarly situated their rights to assemble, to speak freely, and to petition the Housing Authority and its employees for redress of grievances. The plaintiffs also ask the Court to enjoin the defendants from arbitrarily evicting from public housing projects the plaintiffs or others similarly situated. They seek costs, including reasonable attorney's fees.

Jurisdiction is invoked under 28 U.S.C. § 1343(3) and 42 U.S.C. § 1983. Jurisdiction is also invoked under 28 U.S.C. § 1331, alleging an amount in controversy in excess of $10,000. The defendants have moved to dismiss on the grounds that the complaint fails to state a claim upon which relief can be granted, and because the amount in controversy is less than $10,000. As the Court has previously noted, jurisdiction is invoked under 28 U.S.C. § 1343(3) and 42 U.S.C. § 1983. Neither of these sections require that the amount in controversy of $10,000 be established. It is unnecessary to take up the jurisdictional question under 28 U.S.C. § 1331.

The Court has jurisdiction. The complaint states a cause of action, and the motion to dismiss is denied. The Court has heard the evidence and the argument of counsel and has considered the case on its merits.

The defendant, Richmond Redevelopment and Housing Authority, is a political subdivision of the Commonwealth of Virginia. Among its other duties, it manages seven public housing projects in the City of Richmond, one of which is Creighton Court. The Authority, in addition to being a public agency of the state, is governed to a large extent by policies formulated by an agency of the United States Government. It is closely connected through financing with the United States Government; there is no doubt that it is a governmental agency, whether state, or federal, or both, we need not determine.

The Holts have been tenants of the Creighton Court project for approximately ten years. In 1958 Mr. Holt organized the Creighton Court Civic Association. He is president of that organization. Its membership has varied from a few to a maximum of 70 or 80 persons. Mr. Holt has attempted to represent the Association in dealing with the Authority, but the Authority has declined to deal with the Association and has advised Mr. Holt that the Authority would deal only with the individual tenants concerning their grievances. Mr. Holt sought to hold civic meetings in the project's community center. This building is not administered by the defendants. Administration of it has been turned over to the Richmond Department of Parks and Recreation, and their policy is not to allow any civic meetings to be held there. The Authority explained that to Mr. Holt. Mr. Holt has held meetings of the civic organization in a church. The Civic Association has held monthly meetings since it was organized in 1958. A notice of one meeting is Sawyer's Exhibit 2, calling for a meeting in the Fourth Baptist Church on July 7, 1966, and pointing out that July 12 is an election day. An employee of the Authority was present at the meeting as an observer. He noticed approximately seven people whom he recognized as tenants.

In June of 1965 Mr. Holt had differences with the officials of the Authority concerning holding civic meetings; as a result, he sent a number of letters to the federal Public Housing Administration and to the United States Attorney General. Those letters are not before the Court. The answers have been introduced, and they indicate that Mr. Holt was complaining about not being able to hold civic meetings on the Authority property. The matter was referred by the federal authorities to the Richmond

Authority. At about the same time Mr. Holt complained to the Mayor of Richmond concerning meetings, and the Mayor received a report from the director of the Authority.

The executive director of the Authority, Mr. Frederick A. Fay, was advised by Creighton Court's local manager of complaints which had come to the manager from other tenants to the effect that Mr. Holt was pressuring the tenants to join his civic organization or to sign his petitions. At the same time it was reported that there was possibly a question of income which Mr. Holt was not reporting.

The lease used by the Authority has been approved by the United States Housing Administration. Paragraph K requires a tenant to notify the landlord of any change in family income or family composition within ten days. The Authority interprets that to mean any substantial change in income; more specifically, it interprets a substantial change of income to be at least $60 annually, because that would amount to a dollar a month difference in the rental paid by the tenant.

During the fall of each year the income of each tenant is reviewed with the manager of the project. In the fall of 1965 Mr. Holt reviewed his income with the manager; it was determined at that time, as it had been previously, that Mr. Holt was unemployed through disability, that his source of income was a social security pension of $150 a month, and that his wife had been working part-time at $18 a week as a maid with the Richmond school board. Their combined total income was $2,903 a year; for their wage and dependency bracket, the rent was $42 a month. Under applicable regulations, they could have earned up to $5000 and still would be qualified for low-rent housing.

In one of these review conferences, the manager told Mr. Holt that he had information that Mr. Holt was painting tenants' apartments and was receiving income which he had not reported. The manager warned that if he persisted in this, he would have to pay additional rent. Mr. Holt told him that he would not continue painting apartments, that he could not do it on a sustained basis, and that he would rather discontinue it than pay any additional rent. That is how the matter was left between them.

In December of 1965 the manager learned from a barber who conducted a shop in the neighborhood that Mr. Holt was cutting some children's hair. Whether the manager sought this information from the barber or whether the barber volunteered it is not altogether clear. It is probably immaterial. The manager asked the barber for the names of people. He was told the names of several tenants, and he interviewed them. From their interview he determined that Mr. Holt was in fact cutting hair and receiving money. At that time he made no computation of the amount of money. In fact, he did not compute the amount of money being received from these persons until May 6, 1966, after this suit was filed. At that time he made a summary not by adding up the figures that people had told him, but by estimating how much Mr. Holt was receiving from cutting hair. He concluded that from the number of times Mr. Holt had cut a child's hair, and the price per hair-cut, that Mr. Holt had gotten $52 from Mrs. Crossin, $18 from Mrs. Crawford, and $4 from Mrs. Shelton. He also learned that Mr. Holt had painted a tenant's apartment and was told that Mr. Holt had received $25 from this. He was satisfied that Mr. Holt was receiving substantial unreported income. Although he later computed this amount to be $99, which would have put Mr. Holt's rent up $2 a month, at the time he made no computation and did not ask Mr. Holt for any additional rent money.

In view of today's testimony, particularly that of Mrs. Crossin, it is extremely doubtful that Mr. Holt was getting $99 extra a year. Mrs. Crossin was offered as a witness by the Authority. She did not testify that she paid $4 every month, as the manager had computed; she said sometimes it was $2 a

month and sometimes she owed money; she never did give the total, although, over a period of approximately eight years she had been paying something.

Mr. Holt has been cutting hair. A part of that money, apparently, has been put into a cub scout troop fund; part of it he has apparently kept for himself. He has been cutting hair for several years. But the amounts received during those years has never been established.

Mr. Holt stopped painting tenants' apartments with the exception of the Anderson apartment. He was told Mrs. Anderson would be evicted if her apartment were not painted. He painted her apartment and told her he could not receive any money for it. Her daughter made a present to one of his children.

The policy of the Authority is to treat the termination of a tenancy as a matter only of last resort. The practice of the Authority, as evidenced by the reports filed with the answers to interrogatories, has been to confront a tenant with the specified item of unreported income with which he is being charged. In some instances the tenant has been allowed to remain, in other cases the tenant has been evicted or required to leave, and sometimes the tenant has left when confronted with the situation.

In January 1966 the resident manager, Mr. Edwards, reported to Mr. Fay that he was conducting an investigation of Mr. Holt. Mr. Fay authorized him to proceed with it, and told him to follow the regular procedures.

The Court finds that the manager did not follow regular procedures. The record shows that leases of tenants have been terminated because of undetermined amounts of unreported income; however, the records also show that no other tenant was evicted with determined unreported income as low as $99 a year. That would be less than $2 per week. Actually, from the evidence submitted today, the amount is probably considerably less than $2 a week. In those instances where the amount has been stated, tenants who were required to leave had income far in excess of $99 a year.

Case histories of tenants whose leases were terminated because of unreported income show that the tenants were confronted with the unreported income and offered an opportunity to explain. If the explanation was satisfactory, the tenants were allowed to remain and adjustment was made in their rent. Tenants who denied it, and the evidence showed otherwise, were required to leave.

Contrary to Mr. Fay's directions to follow regular procedures, the manager did not discuss with Mr. Holt the information that he received about unreported income concerning hair cutting. Mr. Holt was never told about the investigation; he never was given an opportunity to discuss the charges about income from hair cutting, and no inquiry was made to determine the current amount of Mrs. Holt's admittedly fluctuating income.

The Court finds that Mr. Holt was given a notice of termination because he was president of the Civic Association. He was treated differently from other tenants. His lease was terminated because he was organizing the tenants, because he was exercising his First Amendment rights of freedom of speech and assembly.

The First Amendment to the Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

Those parts of the First Amendment which concern freedom of speech and assembly have been made applicable to the states by the Fourteenth Amendment. I hardly think, however, that we have to determine that this is purely a state agency, since it is so closely connected with the Federal Government.

■ Tenants in public housing projects have no vested right in their tenancy. Housing Authority of City of Pittsburgh

v. Turner, 201 Pa.Super. 62, 191 A.2d 869 (1963). But a tenant's continued occupancy in a public housing project cannot be conditioned upon the tenant's foregoing his Constitutional rights. Lawson v. Housing Authority of City of Milwaukee, 270 Wis. 269, 70 N.W.2d 605 (1955), cert. den. 350 U.S. 882, 76 S.Ct. 135, 100 L.Ed. 778 (1955). A similar problem arose in Housing Authority of the City of Durham v. Thorpe, 267 N.C. 431, 148 S.E.2d 290 (1966), vacated and remanded, 386 U.S. 670, 87 S.Ct. 1244, 18 L.Ed. 2d 394 (U.S. Apr. 17, 1967) (No. 712). There, however, the court found as a matter of fact that whatever may have been the plaintiff's reason for terminating the lease, it was neither because the defendant had engaged in efforts to organize the tenants nor because she had been elected president of a tenant's group. It is that factual distinction which makes that decision inapplicable to the case at bar.

In NAACP v. State of Alabama, 377 U.S. 288, 309, 84 S.Ct. 1302, 1315, 12 L.Ed.2d 325 (1964) the Supreme Court said: "This case, in truth, involves not the privilege of a corporation to do business in a State, but rather the freedom of individuals to associate for the collective advocacy of ideas." Quoting from Bates v. City of Little Rock, 361 U.S. 516, 523, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960), the Court continued: " 'Freedom such as * * * [this] are protected not only against heavy-handed frontal attacks, but also from being stifled by more subtle Governmental interference.' "

The Court holds that the rights granted by the First Amendment are too valuable to be frittered away under the guise of breach of contract based upon an ex parte computation of income attributed to hair cutting.

An injunction restraining the Authority from proceeding to evict the plaintiffs, or from in any way curtailing the plaintiffs' rights to exercise their first amendment rights, will be granted. The Court further concludes that the evidence does not disclose that all of the tenants as a class are being similarly threatened, and the injunction will not be phrased in terms of a class suit. The Court also concludes that this is not a case for the allowance of attorney's fees. The Authority deals at arm's length with the tenants. The case of Rolax v. Atlantic C. L. R. R., 186 F.2d 473 (4th Cir. 1951), upon which the plaintiffs rely for attorney's fees, concerned a labor union and a member which stood in a semi-fiduciary relationship. The case is not controlling.

Costs will be assessed against the defendants.