**Edmund CARRERA and Pat Michael, Appellants,**

v.

**Luisa Rodriguez YEPEZ [1], Carmen Talamantes, Antonio R. Carrillo, and Dora Caldera, Appellees.**

**No. 08–98–00186–CV.**

Court of Appeals of Texas, El Paso.

Oct. 28, 1999.

---

1. At various places throughout the record, Appellant Luisa Rodriguez Yepez is referred to as "Rodriguez" and in other places as "Yepez." For purposes of continuity, we will refer to her as "Yepez," the manner in which she identifies herself in her brief on the merits in this Court.

Michael C. Crowley, Dunbar, Crowley & Hegeman, L.L.P., Edward Dunbar, El Paso, for appellants.

Jaime Sanchez, Justo Fernandez-Gonzalez, El Paso Legal Assistance Society, for appellees.

Before Panel No. 2 BARAJAS, C.J., McCLURE, and CHEW, JJ.

## OPINION

ANN CRAWFORD McCLURE, Justice.

Edmund Carrera and Pat Michael (collectively Appellants) appeal the denial of summary judgment on the basis of qualified immunity. By two points of error, Appellants challenge the ruling of the trial court. Finding no error, we affirm.

## FACTUAL SUMMARY[2]

Appellees are residents of the Kennedy Brothers Complex, a public housing project in El Paso, Texas. Yepez, Carrillo, and Caldera were officers of the Kennedy Brothers Residents' Council (the Council), a tenants' organization. Appellant Carrera was the Executive Director of the El Paso Housing Authority (EPHA); Appellant Michael was an eligibility officer and supervisor with EPHA. The Residents' Council and EPHA were parties to an agreement by which EPHA funded the Council and in consideration of such funds, the Council agreed that the monies would be expended to promote better community relations, serviceability, efficiency, economy, and stability in the housing complex.

On December 5, 1989, the Council officers were notified by EPHA that it had terminated its recognition of the Kennedy Residents' Council because of their alleged failure to cooperate with certain program initiatives proposed by EPHA.[3] Appellees were given no prior notice and the termination was effective immediately. This notice, signed by Carrera, also announced that new elections for the Council would be conducted on December 7. At the December 7 meeting, Carrera refused to allow residents to vote for the officers who had

2. Because this is a summary judgment proceeding, all facts favorable to the non-movants are taken as true.

3. The termination notice provides:
On October 27, 1989, the Kennedy Resident Council Officers were asked to acknowledge affirmation that the Council would cooperate with and participate in the Housing Authority's grant application to eliminate the problem of drugs and drug related crime in the Kennedy Project. Refusal of the Council to support or participate in these programs may cause EPHA to be ineligible for approximately $187,000 in grant allocated funds for the HUD Public Housing Drug Elimination Program.
This refusal contradicts the Resident Council's agreement to comply with contractual obligations to promote better community relations, service-abiality [sic], economy, efficiency and stability in the complex which Council represents. Instead, Council has been promoting instability by advocating issues of a controversial nature within and throughout the project sites.

been terminated on December 5.[4] Another meeting to elect officers was subsequently held December 9. Laura Chin, an EPHA resident program counselor, conducted the election. Chin subsequently alleged that at that meeting, Yepez assaulted her by grabbing her by the arms.

On December 11, Yepez was served with a three-day notice to vacate her apartment alleging that she had violated her lease agreement by assaulting Chin two days before. Yepez was advised that if she did not vacate her apartment, legal proceedings would be initiated against her. She was further advised that she would not be permitted to utilize the EPHA informal and formal grievance procedures[5] because of the seriousness of the alleged violation. On December 22, EPHA filed a forcible entry and detainer (FED) action against Yepez and Talamantes.[6]

At the trial *de novo* of the FED proceedings, Laura Chin testified that she was instructed to "do anything possible to get [Yepez] off the resident council, whether by finding a discrepancy within the resident manual or getting her to comply with signing certain forms for grants which was not obligatory." Chin took such a form to Yepez who refused to sign it until her attorney reviewed the document. It was her failure to sign the form that triggered the termination of the Kennedy Brothers Residents' Council.

Chin also testified concerning the December 7 and December 9 elections. Attendance sign-in sheets were maintained in order to establish that a quorum was present and voting. The elections on December 7 were conducted by written ballot, which was not required. Carrera and other EPHA employees were present, which Chin characterized as unusual. Armida Jelsovar was elected as president; Fernando Rizo was elected as vice-president. Chin testified that there were approximately thirty residents in attendance and she was not aware that any additional residents had arrived between the elections of Jelsovar and Rizo. Nevertheless, the decision was made to invalidate the election of Rizo. Chin testified:

Q: When Mr. Rizo's election was called inappropriate, whatever term was used, why wasn't Mrs. Jelsovar's election deemed invalid?

A: Mr. Carrera had no problems with Armida Jelsovar; he had a problem with Mr. Rizo within the resident council.

Q: Why was there a problem?

A: Because he was very close to [Yepez].

4. Carrera's presence at the election was described as unusual. Pat Michael testified that there were thirty-two resident councils and elections were held that year at all of them except for two or three. Carrera attended only the Kennedy Brothers Residents' Council election of December 7. Laura Chin attended all of the resident council elections and testified that Carrera only attended the one.

5. Public housing authorities (PHAs) were established throughout the country under the United States Housing Act of 1937, ch. 896, 50 Stat. 888, 42 U.S.C. § 1401 *et seq.*, (1970 ed.), to provide affordable housing for low income individuals. *Wright v. City of Roanoke Redevelopment and Housing Authority,* 479 U.S. 418, 419–20, 107 S.Ct. 766, 768, 93 L.Ed.2d 781 (1987). In 1985, Congress enacted 42 U.S.C. § 1437d(k)(1982 ed., Supp. III), which directed the office of Housing and Urban Development (HUD) to continue its longstanding regulatory requirement that each PHA provide formal grievance procedures for the resolution of tenant disputes with the PHA arising out of their lease or PHA regulations. These procedures include informal and formal hearings and administrative appeals, conducted within each PHA by *impartial decision makers, to consider adverse decisions taken against tenants by the PHA. "HUD itself has never provided a procedure by which tenants could complain to it about the alleged failures of PHA's to abide by their annual contribution contracts, the Brooke Amendment, or HUD regulations; nor has it taken unto itself the task of reviewing PHA grievance procedure decisions."* *Wright,* 479 U.S. at 426, 107 S.Ct. at 771–72.

6. Yepez lived with Talamantes in the complex. The lease designated Yepez as the head of household and referred to Talamantes as her spouse.

Q: Who was very close to—

A: Mr. Rizo. They were friends.

Q: And what was your understanding of why they knocked Mr. Rizo's election out?

A: Maria Luisa Hernandez, the supervisor there at Housing, and Mr. Carrera had informed me before the elections took place, that Mr. Rizo would be running for a position on the resident council, and they asked me to look through the files and not to have him elected. They just said they didn't want him on the council, so we tried to find something so he would not be on the council, so we came up with too many ballots.

Q: Who issued the ballots?

A: They were issued as they signed in, as they came in, they were issued slips of paper.

Q: It wasn't, you know, people raising their hands, anything like that?

A: No, it was a written ballot.

After Rizo's election was invalidated, an election for the positions of vice-president, treasurer, secretary, and sergeant-at-arms was scheduled for two days later, which brings us to the election of December 9. Prior to the meeting, Carrera told Chin that if the election got out of hand, she was to call security and have Yepez "thrown out." Yepez, Rizo, and Rizo's wife arrived early while Chin was setting up for the meeting. Once a quorum was present, Yepez stood and announced that the meeting was illegal and against regulations because it was being held on a Saturday.

Rizo stood and crossed his name and his wife's name off the attendance sign-in list. When another resident came forward to cross out her name, Chin began to gather her papers to leave. Yepez then attempted to cross her own name off the list and a scuffle ensued with Yepez and Chin grabbing at one another. According to Chin, "that's what [sic] all hell broke loose." Chin was instructed by Helen Perez, a supervisor, to call the police and make a report of the incident. It would not have occurred to her to file a police report had she not been instructed to do so by a supervisor. She described the incident as "just an accident, you know, when she happened to ·grab me and I happened to grab her, and it wasn't life threatening."

The following Monday, Chin returned to work. As she walked into Carrera's office, "[h]e was jumping around. He was elated. He kept saying, 'We finally got her. We are finally going to be able to get her out.[7] We'll get her out on a three-day.' "[8] Carrera and Michael told Chin "to put in the statement that I had been bruised in the confrontation with [Yepez], that I had been bruised in the arm, and to say that I was traumatized by the whole thing." Chin complied.

Q: And did you in fact do that?

A: Yes, I did.

Q: Why did you do it?

A: Because I knew my job was on the line if I didn't do it.

Q: And when you did the report on Mrs. Yepez, were you told what it was going to be used for?

A: No, I was not.

---

7. Chin testified that there were numerous allegations against Carrera which Yepez had reported to HUD, to the press and to then-Congressman Ron Coleman. He was also aware of her political involvement with LULAC. It was for these reasons that Carrera wanted Yepez evicted from the complex.

8. The "three-day" reference referred to a three-day eviction notice rather than the customary thirty-day notice. The thirty-day procedure implicates the informal grievance process. If, however, there is a serious threat to the health and safety of the other tenants or employees, EPHA is allegedly authorized to bypass all other steps and just issue a three-day notice. The "assault" on Chin was perceived by EPHA as a serious threat to the health and safety of an employee. Appellant Pat Michael testified that EPHA initiates some 350 to 400 evictions per year. Of those, only nine or ten involve the three-day notice procedure.

Q: You didn't know if that report was going to be used to evict Mrs. Yepez?

A: Well, when I saw Mr. Carrera so elated over what had happened to Mrs. [Yepez], I knew what it was going to be used for.

. . .

Q: Ms. Chin, what happened to your job?

A: Well, after I learned about the eviction, I started thinking twice about what I was being asked to do. I felt very guilty because I didn't feel that I should be used in such a way because I didn't feel that Mrs. [Yepez] should be evicted from her apartment for doing something that really was nothing.

. . .

Q: Did Mr. Carrera tell you anything about that?

A: He said to me one time, when I was in his office, to keep my mouth shut. He said that if I wanted to be a permanent employee to keep my mouth shut. He said if I kept my mouth shut that he would make me permanent. I said to him, 'Let me get this straight. If I keep my mouth shut, I'll be made permanent?' He said, 'Yes, but if you repeat it to anybody, I'll deny it.'

Chin was transferred to a different position, reprimanded, suspended, and ultimately terminated.

Mario Gutierrez testified that as a Housing Eligibility Coordinator, it was his function to take complaints, investigate, and determine what action to take. He decided to proceed with eviction proceedings against Yepez and to issue the three-day notice, bypassing the grievance procedures. He made this decision based on the fact that Yepez had assaulted an employee in public in front of a number of people.[9] He first learned of the incident on the following Monday and identified a statement which Chin had written at the direction of Pat Michael on that Monday morning. Chin gave him a list of people who had witnessed the altercation and he "spoke to them for an hour or two, several people." Customarily, he investigated a complaint "on average, anywhere from a week to two weeks." In this instance, however, he signed the three-day notice on the very same day he received the complaint and personally delivered it to Yepez at 3:20 p.m. that afternoon.

Gutierrez also compared and contrasted the types of situations in which a thirty-day notice was given.

Q: Mr. Gutierrez, do you give 30–day notices for a serious incident?

A: Some cases.

Q: And in some cases you don't?

A: That's right.

Q: Have you at any point in time given a 30–day notice involving incidents where shotguns were used, where people had been murdered, anything of that nature?

A: We have.

Q: And yet in this case you are alleging that Mrs. Yepez—the allegations are that Mrs. Yepez grabbed somebody's arm and you gave her a three-day notice, is that correct?

A: That's correct.

The record reveals that thirty-day notices were provided when a tenant's son was charged with murder; when a tenant's son allegedly sexually assaulted a minor; and when a tenant committed aggravated assault by stabbing the complainant. Three-day notices were issued when a tenant had assaulted the complainant with a motor vehicle and had made ongoing threats to other tenants, and when a tenant had assaulted and threatened the life of a securi-

9. Pat Michael, Gutierrez' immediate supervisor, testified that she *instructed* Gutierrez "to take action" against Yepez. Michael's immediate supervisor was Edmund Carrera.

ty guard. In the latter instance, the tenant had also been in possession of drugs and had caused extensive property damage.

The jury in the FED action resolved the issues in favor of Yepez and Talamantes, finding that they had not committed a serious violation of their lease. As a result, their tenancy was not terminated and they remain, to date, tenants of EPHA.

Appellees then filed suit against Carrera, Michael, EPHA, and the members of its Board of Commissioners [10] alleging that they had impeded the efforts of the tenants to organize in violation of 12 U.S.C. § 1715z–1b(b)(4) and 42 U.S.C. § 1983. Appellees also alleged that Appellants violated their rights to freedom of speech and association in violation of the First Amendment to the United States Constitution and 42 U.S.C. § 1983. Yepez additionally asserted a cause of action for intentional infliction of emotional distress. Appellants filed their motion for summary judgment asserting that they were entitled to official immunity. The trial court denied the motion and this appeal follows. By two issues for review, Appellants contend that the affirmative defense of qualified immunity shields them from complaints that they failed to use the administrative grievance procedure and from complaints regarding the tenants' right to organize.

## JURISDICTION

 Generally speaking, we do not have jurisdiction over an appeal from the denial of a motion for summary judgment because the order is interlocutory in nature. *Novak v. Stevens*, 596 S.W.2d 848, 849 (Tex.1980); *Bexar County v. Giroux–Daniel*, 956 S.W.2d 692, 693 (Tex.App.—San Antonio 1997, no pet.). However, we may entertain an appeal from an order denying a motion for summary judgment predicated on an assertion of immunity by an individual who is an officer or employee

of the State or a political subdivision of the State. Tex.Civ.Prac. & Rem.Code Ann. § 51.014(5)(Vernon 1997). This provision includes an appeal from the denial of summary judgment based on qualified immunity. *Giroux–Daniel*, 956 S.W.2d at 694, citing *Newman v. Obersteller*, 960 S.W.2d 621 (Tex.1997).

## STANDARD OF REVIEW

 The standard of review on appeal of a summary judgment is whether the movant at the trial level carried its burden of showing that there is no genuine issue of material fact and that judgment should be granted as a matter of law. *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471 (Tex.1991); *Nixon v. Mr. Property Management Co., Inc.*, 690 S.W.2d 546, 548 (Tex.1985). Thus, the question is not whether the summary judgment proof raises fact issues as to required elements of the movant's cause or claim, but whether the summary judgment proof establishes, as a matter of law, that there is no genuine issue of material fact as to one or more elements of the movant's cause or claim. *Gibbs v. General Motors Corp.*, 450 S.W.2d 827, 828 (Tex.1970). In resolving the issue of whether the movant has carried this burden, all evidence favorable to the non-movant must be taken as true and all reasonable inferences, including any doubts, must be resolved in the non-movant's favor. *Nixon*, 690 S.W.2d at 548–49; *Stoker v. Furr's, Inc.*, 813 S.W.2d 719, 721 (Tex.App.—El Paso 1991, writ denied). Where the defendants are the movants and they submit summary judgment evidence disproving at least one essential element of each of plaintiff's causes of action, then summary judgment should be granted. *Perez*, 819 S.W.2d at 471; *Bradley v. Quality Service Tank Lines*, 659 S.W.2d 33, 34 (Tex.1983). Alternatively, the defendant-movant must conclusively establish each essential element of an affirma-

10. Mario Gutierrez was also named as an individual defendant. The trial court found no genuine issue of any material fact as to his assertion of official immunity and entered summary judgment in his favor. He is not a party to this appeal.

tive defense as a matter of law such that there is no genuine issue of material fact. Hon. David Hittner & Lynne Liberato, *Summary Judgments in Texas,* 34 Hous. L.Rev. 1303, 1351 (1998); *Montgomery v. Kennedy,* 669 S.W.2d 309, 310–11 (Tex. 1984); *Swilley v. Hughes,* 488 S.W.2d 64, 67 (Tex.1972). The defendant urging summary judgment on an affirmative defense is in much the same position as a plaintiff urging a motion for summary judgment on an affirmative claim. *Id.* The movant must come forward with summary judgment evidence for each element of the affirmative defense. *Nichols v. Smith,* 507 S.W.2d 518, 520 (Tex.1974). Unless the movant conclusively establishes the affirmative defense, the respondent plaintiff has no burden to present summary judgment evidence to the contrary. *Torres v. Western Casualty & Sur. Co.,* 457 S.W.2d 50, 52 (Tex.1970); *see also Deer Creek Ltd. v. North Am. Mortgage Co.,* 792 S.W.2d 198, 200 (Tex.App.—Dallas 1990, no writ)(holding that when mortgage company sufficiently pleaded and proved release, burden shifted to debtor to raise fact issue as to legal justification for setting aside release).

■ The affirmative defense of qualified immunity, however, gives rise to shifting burdens. The Fifth Circuit has explained it as follows:

> In this circuit, the qualified immunity defense involves a shifting burden of proof. Although we sometimes short-handedly refer to only one party's burden, the law is that both bear a burden. The defendant official must initially plead his good faith and establish that he was acting within the scope of his discretionary authority.... Once the defendant has done so, the burden shifts to the plaintiff to rebut this defense by establishing that the official's allegedly wrongful conduct violated clearly established law.... The Fifth Circuit does not require that an official demonstrate that he did not violate clearly estab-

lished federal rights; our precedent places that burden upon plaintiffs.

*Salas v. Carpenter,* 980 F.2d 299, 306 (5th Cir.1992).

### QUALIFIED IMMUNITY

■ Referencing *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), Appellants claim qualified immunity. Qualified immunity is an immunity from suit available to government officials sued in their individual capacities under Section 1983. *Giroux–Daniel,* 956 S.W.2d at 694, *citing Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 166, 113 S.Ct. 1160, 1162, 122 L.Ed.2d 517 (1993).

### *Harlow Analysis*

*Harlow* involved a suit for civil damages against two senior White House aides to former President Richard M. Nixon, who allegedly conspired to violate the constitutional and statutory rights of an individual who was dismissed from employment by the Air Force following his testimony to Congress. The Court began by recognizing two kinds of immunity defenses—absolute immunity (accorded to legislators, members of the judiciary, and certain members of the executive branch) and qualified immunity. *Id.,* 457 U.S. at 807, 102 S.Ct. at 2732.

> Qualified or 'good faith' immunity is an affirmative defense that must be pleaded by a defendant official.... Decisions of this Court have established that the 'good faith' defense has both an 'objective' and a 'subjective' aspect. The objective element involves a presumptive knowledge of and respect for 'basic, unquestioned constitutional rights.' ... The subjective component refers to 'permissible intentions.' Characteristically the Court has defined these elements by identifying the circumstances in which qualified immunity would *not* be available. Referring both to the objective and subjective elements, we have held that qualified immunity would be defeat-

ed if an official *'knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], *or* if he took the action *with the malicious intention* to cause a deprivation of constitutional rights or other injury....' [Citations omitted]. [Emphasis in original].

*Harlow*, 457 U.S. at 815, 102 S.Ct. at 2736–37. The Court then modified the test, eliminating the subjective inquiry:

Consistently with the balance at which we aimed in *Butz*,[11] we conclude today that bare allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery. We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.... On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful. Until this threshold immunity question is resolved, discovery should not be allowed. If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct. Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained. But

again, the defense would turn primarily on objective factors.

*Harlow*, 457 U.S. at 817–819, 102 S.Ct. at 2738. The *Harlow* construct applies to the case at hand. "It would be untenable to draw a distinction for purposes of immunity law, between suits brought against state officials under 42 U.S.C. § 1983 and suits brought directly under the Constitution against federal officials." *Harlow*, 457 U.S. at 809, 102 S.Ct. at 2733, *citing Butz*, 438 U.S. at 504, 98 S.Ct. at 2909.

### The Aftermath of Harlow

■ The *Harlow* decision drew quick criticism. *See* Note, *Qualified Immunity for Government Officials: The Problem of Unconstitutional Purpose in Civil Rights Litigation*, 95 YALE L.J. 126 (1985). First commenting that the purely objective standard of qualified immunity announced in *Harlow* was a radical departure from prior law, the case note then addressed some glaring omissions:

In reformulating the qualified immunity defense, however, the Supreme Court failed to distinguish between 'malice' as an element necessary to rebut an official's qualified immunity defense and 'state of mind' as an element of the plaintiff's substantive claim. It is unlikely that the Court meant for *Harlow* to prevent a plaintiff from inquiring into the reasons behind an official's conduct when the substantive law controlling the plaintiff's claim makes the official's state of mind a necessary component of the constitutional violation.

*Id.* at 127. In other words, while inquiry into an official's state of mind is inappropriate for purposes of qualified immunity, *Harlow* should not prohibit an inquiry when it is necessary to establish a valid substantive claim. *Id.* Subjective issues in substantive constitutional doctrine have arisen when the constitutional guarantee requires a showing of specific intent to establish a violation. A purposeful discriminatory intent is required to establish

---

**11.** *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978).

an equal protection violation. Further, the violation of constitutional rights guaranteed by the First and Fourth Amendments often depend upon the motivation for the allegedly wrongful conduct. Conduct which is legally valid on its face will constitute a violation if undertaken for a constitutionally impermissible purpose. *Id.* at 135–36. If the official acted with an unconstitutional purpose, thereby violating a clearly established constitutional right, he is liable in damages regardless of whether he had a reasonable basis for believing that the actions were lawful. *Id.* at 143.

The Fifth Circuit addressed this issue in *Tompkins v. Vickers,* 26 F.3d 603 (5th Cir.1994). There, a high school art teacher brought a Section 1983 action against Dr. Nolan Vickers, the school district superintendent, alleging that he was unconstitutionally transferred to less desirable employment in retaliation for publicly criticizing the superintendent and district administration for canceling an art program at an "historically black junior high school" while leaving in place the same art program at an "historically white junior high school." The trial court denied Vickers' motion for summary judgment predicated on qualified immunity, and he appealed, alleging that Tompkins had not produced specific, direct proof that Vickers had an unconstitutional motive in transferring Tompkins. He contended that under *Harlow,* the public official's state of mind was no longer relevant in deciding a claim of qualified immunity. The Fifth Circuit disagreed:

> But in *Harlow,* the public official's state of mind was not an essential element of the underlying constitutional violation. Every Circuit that has considered the question has concluded that a public official's motive or intent must be considered in the qualified immunity analysis where unlawful motivation or intent is a critical element of the alleged constitutional violation.

*Tompkins,* 26 F.3d at 607. The Court noted that a plaintiff need not produce direct evidence of an illegitimate intent. "Circumstantial evidence is equally as probative as direct evidence in proving illegitimate intent. Also, direct evidence of an improper motive is usually difficult, if not impossible, to obtain." *Id.* at 609. The Court concluded that the trial court correctly determined the existence of a genuine factual dispute as to Vickers' motivation for approving Tompkins' transfer.

The Supreme Court has recently reviewed the *Harlow* standard for judging the defense of qualified immunity. Noting that *Harlow* articulated a single objective standard, it announced:

> Under that standard, a defense of qualified immunity may not be rebutted by evidence that the defendant's conduct was malicious or otherwise improperly motivated. Evidence concerning the defendant's subjective intent is simply irrelevant to that defense.
>
> Our holding that 'bare allegations of malice' cannot overcome the qualified immunity defense did not implicate the elements of the plaintiff's initial burden of proving a constitutional violation. It is obvious, of course, that bare allegations of malice would not suffice to establish a constitutional claim. It is equally clear that an essential element of some constitutional claims is a charge that the defendant's conduct was improperly motivated.... Thus, although evidence of improper motive is irrelevant on the issue of qualified immunity, it may be an essential component of the plaintiff's affirmative case.

*Crawford–El v. Britton,* 523 U.S. 574, 118 S.Ct. 1584, 1592, 140 L.Ed.2d 759 (1998). We also find guidance in Chief Justice Rehnquist's dissent to that opinion:

> I would ... conclude ... that a government official who is a defendant in a motive-based tort suit is entitled to immunity from suit so long as he can offer a legitimate reason for the action that is being challenged, and the plaintiff is unable to establish, by reliance on objec-

tive evidence, that the offered reason is actually a pretext.

. . .

In order to preserve the protections that *Harlow* conferred, it is necessary to construct a qualified immunity test in this context that is also based exclusively on objective factors, and prevents plaintiffs from engaging in 'peculiarly disruptive' subjective investigations until after the immunity inquiry has been resolved in their favor. The test I propose accomplishes this goal. Under this test, when a plaintiff alleges that an official's action was taken with an unconstitutional or otherwise unlawful motive, the defendant will be entitled to immunity and immediate dismissal of the suit if he can offer a lawful reason for his action and the plaintiff cannot establish, through objective evidence, that the offered reason is actually a pretext.

*Id.,* 118 S.Ct. at 1599–1600 (Rehnquist, C.J., dissenting).

Thus, in motive-based cases such as this one, where the legality of a defendant's actions depends on the defendant's motive or intent, the qualified immunity analysis necessarily encompasses a consideration of the defendant's intent. *Giroux–Daniel,* 956 S.W.2d at 697; *see also O'Connor v. Chicago Transit Auth.,* 985 F.2d 1362, 1367 (7th Cir.1993); *Feliciano–Angulo v. Rivera–Cruz,* 858 F.2d 40, 47 (1st Cir. 1988).

### *Implementing Harlow:*

### *The Texas Two–Step*

■ Applying these principles, our analysis focuses on two inquiries:

First, in reviewing a denial of qualified immunity, we determine whether plaintiffs have stated a violation of rights secured by the Constitution.... Since qualified immunity turns on whether a defendant violated a clearly established right, a 'necessary concomitant' to that decision is determining 'whether the plaintiff has asserted a violation of a constitutional right at all.' ... If plaintiffs cross this threshold, we next examine the objective reasonableness of the defendant official's conduct. [Citations omitted].

*Salas,* 980 F.2d at 305–06. And if we are to consider motive or intent, where does it fit?

The fact that *Harlow* generally forbids inquiry into an official's subjective state of mind for purposes of defeating a qualified immunity defense does not foreclose such an inquiry for the distinguishable purpose of determining whether the defendant violated the plaintiff's clearly established constitutional rights.

1 Joseph G. Cook & John L. Sobieski, Jr., Civil Rights Actions ¶ 2.06[B], at 2–239 & n. 31 (1999), *citing Rakovich v. Wade,* 850 F.2d 1180, 1210 (7th Cir.)(*en banc* ), *cert. denied,* 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988) (" '[U]nder *Harlow* the district court must conduct a two-part analysis: (1) does the alleged conduct set out a constitutional violation? and (2) were the constitutional standards clearly established at the time in question? ... Intent is relevant to (1) but not to (2).' ").

### DOES THE ALLEGED CONDUCT SET OUT A CONSTITUTIONAL VIOLATION?

Appellees categorized their pleadings according to three generic causes of action: violation of tenants' right to an administrative grievance proceeding, violation of tenants' right to organize, and intentional infliction of emotional distress. We look first to the specific pleadings.

### *Tenant Grievance Procedure*

Appellees alleged below that Appellants violated the Fourteenth Amendment to the United States Constitution by denying them due process and equal protection of the law. Specifically, Appellees contended:

The Secretary of HUD did not certify that pre-eviction procedures in Texas courts meet required due process standards prior to Defendants' filing of their forcible detainer case against Plaintiffs [Yepez] and Talamantes. Pursuant to 42 USC Section 1437d(k), Plaintiffs therefore must be given an opportunity to utilize Defendants' formal and informal grievance procedures before Court proceedings are instituted against them.

. . .

In addition, Defendants make determinations as to which tenants will be permitted to use grievance procedures and which tenants will be denied access to those procedures arbitrarily and in the absence of any objective or ascertainable standards, in violation of Plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. Section 1983. In addition, Defendants' refusal to permit Plaintiffs [Yepez] and Talamantes to utilize Defendants' formal and informal grievance procedures, when persons ac-

cused of far more serious violations are permitted to use those procedures, is irrational, arbitrary and unreasonable and denies Plaintiffs their rights to equal protection of the laws under the Fourteenth Amendment to the United States Constitution and 42 USC Section 1983.

Defendants' denial of Plaintiffs' rights were motivated, in whole or in part, to retaliate against Plaintiff [Yepez] for her activities on the Resident's Council and her alleged disagreement with certain of Defendants' program or policy goals, thereby violating [Yepez'] right to freedom of speech under the First Amendment and 42 USC Section 1983.

In their first issue for review, Appellants contend that Yepez and Talamantes had no clearly established right to informal hearings administered through the tenant grievance procedure. In support of their argument, they rely on both the tenant lease [12] and the Code of Federal Regulations [13] which they interpret as permitting a bypass of the grievance procedure. Because the grievance process does not apply

12. The tenant lease provides:

**14. *Grievance Procedure***
All grievances, disputes or appeals arising under this Lease shall be processed and resolved pursuant to the current Grievance Procedure as posted in the Project Office and incorporated herein by reference.
The EPHA Grievance Procedure shall not apply to evictions or termination of residency based upon a resident's creation or maintenance of a threat to the health or safety of other Residents or EPHA employees.

13. The lease provision is mandated by the Code of Federal Regulations. Section 966.50 provides that PHAs shall establish and implement a grievance procedure to assure that tenants are afforded an opportunity for a hearing which shall be incorporated into the housing leases. 24 C.F.R. § 966.50. Further,

(a)(1) The PHA grievance procedure shall be applicable (except as provided in paragraph (a)(2) of this section) to all individual grievances as defined in Sec. 966.53 of this subpart between the tenant and the PHA. (2)(i) The term due process determination means a determination by HUD that law of

the jurisdiction requires that the tenant must be given the opportunity for a hearing in court which provides the basic elements of due process (as defined in Sec. 966.53(c)) before eviction from the dwelling unit. If HUD has issued a due process determination, a PHA may exclude from the PHA administrative grievance procedure under this subpart any grievance concerning a termination of tenancy or eviction that involves:
(A) Any criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises of other residents or employees of the PHA. . . .
24 C.F.R. § 966.51(a). "Grievance" refers to "any dispute which a tenant may have with respect to PHA action or failure to act in accordance with the individual tenant's lease or PHA regulations which adversely affect the individual tenant's rights, duties, welfare or status." 24 C.F.R. § 966.53(a). "Elements of due process" as defined in 24 C.F.R. § 966.53(c) include adequate notice to the tenant of the grounds for terminating the tenancy and for eviction. Here, Yepez and Talamantes contend they were entitled to a thirty-day notice, rather than a three-day notice.

to evictions based upon a resident's creation of a threat to the health or safety of EPHA employees, Appellants contend that the altercation/assault at the December 9 meeting justified a bypass and that they were entitled to proceed directly to eviction. Appellees counter that the safety threat is a mere sham or pretext and that Appellants harbored an impermissible retaliatory motive. They further contend that the grievance procedure is a right guaranteed by statute.[14]

### Tenants' Right to Organize

In their fourth amended petition, Appellees alleged:

Defendant EPHA unilaterally breached its contract with Plaintiffs [YEPEZ], CALDERON and CARRILLO by, inter alia, removing them from their positions as officers of the Kennedy Resident Council for reasons not authorized by the contract and without providing 30 days written notice.

In addition, Defendants EPHA and CARRERA acted arbitrarily and capriciously by failing to follow the requirements of the Resident Council Handbook in that, inter alia, Defendants called elections with insufficient notice, failed to have a neutral party run those elections and refused to permit residents to vote for persons of their choice.

In addition, Defendants LEAL and BOARD acted arbitrarily and capriciously by, inter alia, refusing to recognize a Council of Presidents, including Plaintiff [YEPEZ], and by refusing to accept a letter from the council, for reasons not authorized by Defendants' own rules and regulations.

In addition, Defendants' actions as described above impeded the reasonable efforts of resident tenant organizations to represent their members and the reasonable efforts of tenants to organize, in violation of 12 U.S.C. Section 1715z—1b(b)(4) and 42 U.S.C. Section 1983.

In addition, Defendants' actions as described above violated tenants' rights to freedom of speech and association, in violation of the First Amendment to the U.S. Constitution and 42 U.S.C. Section 1983.

In their second issue for review, Appellants contend that in order to seek redress through Section 1983, a plaintiff must assert the violation of a federal right, and not merely a violation of law. Appellants contend that the Appellees reliance on 12 U.S.C. § 1715z–1b(b)(4) is misplaced because Appellees are not the intended beneficiaries of the statute. Appellees essentially concede this issue on appeal. Appellants next address the allegation that Carrera acted arbitrarily and capriciously by failing to follow the requirements of the Residents' Council Handbook, which they construe as a conclusory allegation which neither describes nor asserts a federally protected right with the necessary specificity. They argue that the failure to follow the handbook does not deprive Appellees of any right secured by the Constitution and laws.

Appellees counter that their First Amendment rights were violated when they were removed as officers of the council without proper notice. Further, Yepez claims that her First Amendment rights were violated when EPHA filed its forcible

---

14. Any agency may exclude from its procedure any grievance concerning an eviction or termination of tenancy in any jurisdiction which requires that, prior to eviction, a tenant be given a hearing in court *which the Secretary [of HUD] determines provides the basic elements of due process.* [Emphasis added].
Housing and Urban–Rural Recovery Act of 1983, sec. 204, Pul. L.N. 98–181, 97 Stat.

1153, 1178 (Codified at 42 U.S.C. § 1437d(k)(1983)). This statutory directive applies to all public housing tenants. 24 C.F.R. § 966.51. The record reveals that as of the date of the altercation between Yepez and Chin, and at the time of the notice of eviction, HUD had not issued a due process determination for the State of Texas pursuant to the Act.

detainer action in retaliation for her exercising her right to speak out on matters of public concern. The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; *or abridging the freedom of speech,* or of the press; *or the right of the people peaceably to assemble,* and to petition the Government for a redress of grievances." [Emphasis added].

### Framing the Issue

Perhaps the Ninth Circuit captured the holding of *Anderson*[15] best when it observed that 'the term 'clearly established right' may be somewhat misleading in that in some cases the relevant inquiry may more properly be described as: whether it is clearly established that the particular act by the public officials constitutes a violation of the right involved, rather than whether the right itself is clearly established.'

1 JOSEPH G. COOK & JOHN L. SOBIESKI, JR., CIVIL RIGHTS ACTIONS, ¶ 2.06[B], at 2–247 & n. 44 (1999), *citing Gutierrez v. Municipal Court,* 838 F.2d 1031, 1048 (9th Cir.1988). We agree. We perceive the proper inquiry to be not whether Appellees were entitled to utilize the tenant grievance procedure or whether Appellants' breach of contract or failure to follow their own rules and regulations violate a federally protected right; instead, we inquire whether the bypass, the eviction proceedings, or the removal of the Residents' Council officers, if motivated by a retaliatory purpose, violated Appellees constitutional rights under the First and Fourteenth Amendments. In other words, properly framed, the issue is whether Appellants violated the constitutional protections of due process and equal protection by beginning eviction proceedings and denying Appellees recourse to the standard grievance procedures in retaliation for their exercising their First Amendment rights to freedom of speech and assembly.

**15.** *Anderson v. Creighton,* 483 U.S. 635, 107

### Tenants' Constitutional Protections

■ A public housing tenant's continued occupancy in a public housing project cannot be conditioned upon the tenant's foregoing a constitutional right. *Holt v. Richmond Redevelopment and Housing Authority,* 266 F.Supp. 397 (E.D.Va.1966). Holt and his wife, tenants of a public housing project for ten years, sought an injunction preventing the housing authority from evicting them and from taking any action which denied them the rights to assemble, speak freely, and to petition for the redress of grievances. Holt organized the project civic association and served as its president. As a result of a dispute between Holt and the housing authority concerning meetings of the civic association on housing authority property, he sent a number of letters to the federal Public Housing Administration and the United States Attorney General. He also complained to the mayor of Richmond. During this time period, the executive director of the housing authority learned of complaints by tenants that Holt was pressuring them to join his civic organization or to sign his petitions. It was also reported that Mr. Holt might not be declaring all of his income because he was working on the side, cutting hair and painting apartments. The resident manager of the project began an investigation of Holt and was authorized to proceed by the executive director, who told him to "follow the regular procedures." The district court concluded that the manager did not follow regular procedures.

Case histories of tenants whose leases were terminated because of unreported income show that the tenants were confronted with the unreported income and offered an opportunity to explain. If the explanation was satisfactory, the tenants were allowed to remain and adjustment was made in their rent. Tenants who denied it, and the evidence showed otherwise, were required to leave.

S.Ct. 3034, 97 L.Ed.2d 523 (1987).

Contrary to [the executive director's] directions to follow regular procedures, the manager did not discuss with Mr. Holt the information that he received about unreported income concerning hair cutting. Mr. Holt was never told about the investigation; he never was given an opportunity to discuss the charges about income from hair cutting, and no inquiry was made to determine the current amount of Mrs. Holt's admittedly fluctuating income.

The Court finds that Mr. Holt was given a notice of termination because he was president of the Civic Association. He was treated differently from other tenants. His lease was terminated because he was organizing the tenants, because he was exercising his First Amendment rights of freedom of speech and assembly.

*Holt,* 266 F.Supp. at 400. Thus, while tenants in public housing projects have no vested right in their tenancy, their continued occupation in a public housing project cannot be contingent upon forfeiture of these fundamental and constitutional rights. *Id.* at 400–401.

### *Retaliatory Motivation*

We first note that the termination notice directed to the officers of the Kennedy Brothers Residents' Council, signed by Carrera, explicitly states that the "Council has been promoting instability *by advocating issues of a controversial nature* within and throughout the project sites." Such a comment could be viewed as a deliberate attempt to chill the public statements of the tenant/Council officers and directly calls into question the motivation and intent of Appellants in canceling the contract between EPHA and the Residents' Council and in removing the officers from their elected positions.

The record also contains affidavits by both Carrera and Michael, together with their sworn testimony at the eviction proceeding. These affidavits generally allege that the actions have been taken in good faith and in Appellants' official capacities. Their testimony at the eviction proceedings does not address the issue of motive, but Laura Chin's testimony raises a question as to the retaliatory nature of Appellants' actions. While it is true that the record contains no direct evidence that Appellants harbored a retaliatory motive for canceling the Appellees' contract or for filing the forcible detainer action, direct evidence is not required in these circumstances. *Giroux–Daniel,* 956 S.W.2d at 698. And while Appellants provided evidence of the alleged incident between Chin and Yepez as precipitating the forcible detainer action, for purposes of our review, this evidence does nothing more than demonstrate that a fact issue exists regarding the motivation behind the filing of the action. *Id.* Construing as we must all reasonable inferences from the evidence in favor of Appellees, we conclude that a fact issue exists regarding the motive for the actions taken against them.

### WERE THE CONSTITUTIONAL STANDARDS CLEARLY ESTABLISHED?

The second prong of our inquiry focuses on whether Appellants' conduct was objectively reasonable, or as Appellants frame the issue, "the relevant question becomes the objective (albeit fact specific) question of whether a reasonable public official could have believed that the conduct in question was unlawful in light of 'clearly established' law." This inquiry does not incorporate a good faith element. *Giroux–Daniel,* 956 S.W.2d at 695–96 n. 4. Whether an asserted federal right was clearly established at a particular time, so that a public official who allegedly violated the right has no qualified immunity from suit, presents a question of law, which we must review *de novo* on appeal. *Elder v. Holloway,* 510 U.S. 510, 516, 114 S.Ct. 1019, 1023, 127 L.Ed.2d 344 (1994).

As to bypassing the grievance procedures, Appellants contend that "the contours of the federal regulation not only did

not prohibit bypassing the grievance procedure; they authorized such action." As to the tenants' right to organize, Appellants couch the analysis in terms of a breach of contract action and do not address the claim that Appellants' actions constituted a violation of rights under the First and Fourteenth Amendments. In our view, the issue is whether Appellants' conduct in beginning eviction proceedings, denying recourse to administrative grievance proceedings, and disenfranchising the tenants of their elected representatives allegedly in retaliation for constitutionally protected activity was objectively reasonable in light of clearly established law. We conclude that it was not.

For more than thirty years, the rights of tenants in public housing projects to the fundamental freedoms of speech and association have been held sacrosanct. *Thorpe v. Housing Authority of City of Durham,* 386 U.S. 670, 679, 87 S.Ct. 1244, 1249, 18 L.Ed.2d 394 (1967)(Douglas, J., concurring)("No more can a tenant in a public housing project be evicted for the exercise of her right of association, a right protected by the First and Fourteenth Amendments.", *citing National Association for the Advancement of Colored People v. Alabama,* 357 U.S. 449, 460, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958)("It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech.")); *Lawson v. Housing Authority of City of Milwaukee,* 270 Wis. 269, 287–88, 70 N.W.2d 605, 615 (Wis.1955), *cert. denied,* 350 U.S. 882, 76 S.Ct. 135, 100 L.Ed. 778 (1955)("This court deems the possible harm which might result in suppressing the freedoms of the First amendment outweigh any threatened evil posed by the occupation by members of subversive organizations of units in federally aided housing projects."); *Holt,* 266 F.Supp. at 401. Accordingly, Appellants' alleged conduct violated clearly established law.

## CONCLUSION

The United States Supreme Court recently enunciated that:

The immunity standard in *Harlow* itself eliminates all motive-based claims in which the official's conduct did not violate clearly established law. Even when the general rule has long been clearly established (for instance, the First Amendment bars retaliation for protected speech), the substantive legal doctrine on which the plaintiff relies may facilitate summary judgment in two different ways. First, there may be doubt as to the illegality of the defendant's particular conduct (for instance, whether a plaintiff's speech was on a matter of public concern). See generally *Anderson v. Creighton,* 483 U.S. 635, 640–641, 107 S.Ct. 3034, 3039–3040, 97 L.Ed.2d 523 (1987). Second, at least with certain types of claims, proof of an improper motive is not sufficient to establish a constitutional violation—there must also be evidence of causation. Accordingly, when a public employee shows that protected speech was a 'motivating factor' in an adverse employment decision, the employer still prevails by showing that it would have reached the same decision in the absence of the protected conduct. *Mt. Healthy City Bd. Of Ed. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977).

. . .

Thus, unlike the subjective component of the immunity defense eliminated by *Harlow,* the improper intent element of various causes of action should not ordinarily preclude summary disposition of insubstantial claims. The reasoning in *Harlow,* like its specific holding, does not justify a rule that places a thumb on the defendant's side of the scales when the merits of a claim that the defendant knowingly violated the law are being resolved. And, *a fortiori,* the policy

concerns underlying *Harlow* do not support Justice Scalia's unprecedented proposal to immunize all officials whose conduct is 'objectively valid,' regardless of improper intent. . . .

*Crawford–El,* 523 U.S. at ——, 118 S.Ct. at 1594. We conclude that the constitutional violations, as alleged, were unlawful in light of clearly established law. Because the violations involve a motive-based tort, and because Appellees presented objective evidence sufficient to create a fact question on Appellants' motive or intent, the trial court properly denied Appellants' motion for summary judgment on the ground of qualified immunity. Appellants' first and second issues for review are overruled and the order denying summary judgment is affirmed.